## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| *ex rel. Susan Ruscher, et al.* | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Civ. Action No. 4:08-cv-3396** |
| **VS.** | § | |
| | § | |
| **OMNICARE, INC.** *et al* | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

Relator Susan Ruscher has brought this False Claims Act ("FCA") *qui tam* lawsuit against Omnicare, Inc., a provider of pharmaceuticals to long-term-care facilities, as well as 200 of its affiliates and its former CEO, Joel Gemunder.  In short, Relator, who served for several years as Omnicare's Collections Manger, has alleged

> an ongoing nationwide fraudulent kickback scheme in which Omnicare induces and retains business from [skilled nursing facilities or 'SNFs'] that provide services to a high volume of Medicare Part D/Medicaid patients, from whom Omnicare derives most of its revenues, in exchange for which Omnicare forgoes its payments for pharmaceuticals dispensed to Medicare Part A patients that the SNFs owe Omnicare.

(Doc. No. 97 ¶ 1.)  Relator also named eight SNFs as Defendants in her live complaint, but she has since dismissed them.  (*See* Doc. No. 119.)

The magnitude of the alleged fraud is great: Relator asserts that, by late 2009, Omnicare's overdue accounts receivable exceeded $720 million, "the majority of which represented kickbacks in the form of forgiven debt."  (*Id.* ¶ 2.)  The scheme, according to Relator, was also long-lasting: she alleges that it began as early as 1998 and continues to this day.  The substance of her allegations fills a 200-page, 700-paragraph Third Amended Complaint ("TAC").  Now

before the Court are two Motions to Dismiss: one on behalf of Omnicare and its affiliates (Doc. No. 120), and another on behalf of Defendant Gemunder (Doc. No. 126).   The Court has reviewed extensive briefing submitted by the parties and the applicable law.  For the reasons set forth below, Omnicare's Motion is **GRANTED IN PART AND DENIED IN PART**. Defendant Gemunder's Motion is **GRANTED**.[1]

I.      **BACKGROUND**

       **A.  Statutory and Procedural Background**

              *1.  Statutory Scheme*

"[A]dopted in 1863 and signed into law by President Abraham Lincoln in order to combat rampant fraud in Civil War defense contracts," S. Rep. No. 99–345, at 8 (1986), the False Claims Act, 31 U.S.C. §§ 3729-3733, aims to ferret out, and impose liability for, "false or fraudulent claims for payment to the United States," *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 (2010).  Among other things, the Act imposes civil liability upon "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the

---

[1] Less pressingly, Relator's Motion to Strike portions of her complaint (Doc. No. 132) is **GRANTED**.  The Court did not consider those sections in its consideration of the Motion to Dismiss.

Government."  31 U.S.C. § 3729(a)(1)(A), (B), & (G).[2]  The Act also expressly bars conspiracies to violate its other provisions.  *Id.* § 3729(C).

Perhaps the Act's most unique feature is that it is one "of a handful of extant laws creating a form of civil action known as *qui tam*."  *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 768 (2000).  "[T]he Government itself may bring a civil action against the alleged false claimant" or "a private person (the relator) may bring a *qui tam* civil action 'for the person and for the United States Government' against the alleged false claimant, 'in the name of the Government.'"  *Id.* at 769 (quoting 31 U.S.C. § 3730(b)(1)).  "As reward for doing so, the relators share in the government's winnings, receiving a bounty of up to thirty percent of the government's proceeds 'depending upon the extent to which the person substantially contributed to the prosecution of the action.'"  *United States ex rel. Babalola v. Sharma*, 746 F.3d 157, 164 (5th Cir. 2014) (Dennis, J., concurring) (quoting 31 U.S.C. § 3730(d)).  All told, FCA *qui tam* suits yield annual recoveries of roughly $3 billion.  *See* Civil Div., U.S. Dep't of Justice, *Fraud Statistics--Overview October 1, 1987-September 30, 2013* (Dec. 23, 2013), http://www.justice.gov/civil/docs_forms/C-FRAUDS_FCA_Statistics.pdf.

When a False Claims Act case is initiated by a private relator, he or she must file suit under seal, 31 U.S.C. § 3730(b)(2), and "the United States is given 60 days to review the claim and decide whether it will 'elect to intervene and proceed with the action.'"  *United States ex rel. Eisenstein v. City of New York, New York*, 556 U.S. 928, 932 (2009) (quoting 31 U.S.C. § 3730(b)(2)).  For good cause, the United States may extend that sixty-day period.  31 U.S.C. § 3730(b)(3).  Where the United States does not elect to intervene, "the relator retains 'the right to

---

[2] The False Claims Act was amended in 2009.  Prior to those amendments, the provisions just quoted were codified at § 3729(a)(1), (2), and (7).

conduct the action.'"  *Eisenstein*, 566 U.S. at 932 (quoting 31 U.S.C. § 3730(c)(3)).  The Government may still elect to intervene at a later date.  31 U.S.C. § 3730(c)(3).

### 2.  *Procedural Background*

Relator Susan Ruscher filed her original complaint in this action in November 2008 and filed her First Amended Complaint a month later.  (Doc. Nos. 1, 5.)  Relator filed a Second Amended Complaint in September 2009.  (Doc. No. 13.)  After a two-year investigation, the Government notified the Court in December 2012 that it would not intervene at that time.  (Doc. No. 45.)  The Court permitted Relator to file the TAC in August 2013, but ruled that she could not rely on documents subpoenaed from Omnicare by the Government.  (*See* Minute Entry, Aug. 29, 2013.)  The now-pending Motions to Dismiss were filed in November 2013.  (Doc. Nos. 120, 126.)

### B.  **Factual Background**[3]

Omnicare is the nation's leader in providing pharmaceutical services to SNFs.  (Doc. No. 97 ¶ 277.)  Among the goods and services it provides are pharmaceuticals, specialty unit-dose packaging, delivery, pharmacist consulting, infusion and respiratory therapy, and medical supplies.[4]  (*Id.*)  Roughly eighty percent of the SNF patients that Omnicare serves are covered by both Medicaid and Medicare.  (*Id.* ¶ 278.)  Prior to 2006, Medicaid covered patients' drugs; since, Medicare Part D has done so.  (*Id.*)  The balance of the SNF patients that Omnicare serves

---

[3] The Court here merely attempts to provide an overview of Relator's factual allegations; it addresses more specific contentions, as necessary, throughout its analysis.  For the purposes of a motion to dismiss, the Court takes Relator's factual allegations as true.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

[4] It is Omnicare's 250 pharmacies which actually enter into contracts with SNFs.  (Doc. No. 97 ¶ 285.)

are covered by Medicare Part A, rendering the institutions at which they reside eligible for reimbursement for limited inpatient stays.  (*Id.* ¶ 278.)

The billing and reimbursement process utilized by Omnicare varied according to whether services were provided to patients covered by Medicare Part A or Medicaid/Medicare Part D. With respect to the patients using the Medicare Part A SNF benefit, the facilities bill Medicare on "a prospective, monthly capitated basis for all services," including pharmaceutical drugs.  (*Id.* ¶ 279.)  The SNFs then purchase the pharmaceuticals and other services from Omnicare, which bills the SNFs after-the-fact.  (*Id.*)

Until 2005, Omnicare contracted with state Medicaid programs to provide pharmaceuticals and related services to SNF residents who were dually eligible for Medicare and Medicaid.  (*Id.* ¶ 280.)  Omnicare submitted reimbursement claims directly to the states for the drugs and services it provided.  (*Id.*)  Once Medicare Part D was created in 2006, Omnicare began to contract with Part D plan sponsors, known as PDPs, to provide pharmaceuticals and related services to dually eligible SNF residents.  (*Id.* ¶ 281.)  Omnicare bills the PDPs directly. (*Id.*)

In theory, the Medicare Part A prospective payments would be used by the SNFs to pay Omnicare for services provided to Part A-eligible individuals.  (*Id.* ¶ 282.)  According to Relator, that is not in fact what occurred.  Rather, certain of Omnicare's biggest SNF clients — known within the corporation as National Accounts, Regional Holds, and P-Holds — were not required to pay Omnicare what they owed.  (*Id.*)  In exchange for that debt forgiveness, Omnicare came to

expect those SNFs to select Omnicare as their pharmacy of choice, both for existing and new facilities, one to which they would steer all of their residents.[5]  (*Id.* ¶¶ 283, 291.)

As a result, the SNFs whose debts were forgiven began to accrue substantial past-due balances, sometimes in excess of $1 million.  (*Id.* ¶ 288.)  Nevertheless, Omnicare's Collections Department was prohibited from contacting National Accounts.  (*Id.* ¶ 287.)  Instead, the National Accounts were serviced by Key Account Managers ("KAMs"), who reported to the Senior Vice President of Marketing and Executive Vice President of Operations.  (*Id.* ¶ 290.)  If Ruscher or anyone on her staff ever tried to contact a National Account, they would be reprimanded by the relevant KAM.  (*Id.* ¶ 290.)  To avoid suspicion, Omnicare's National Facility Credit and Collections Manager instructed collections department employees to note in the customer's file that the collections department had made a "reasonable attempt" to collect the past-due balance, though they never actually did so.  (*Id.* ¶ 293.)  The futility of its efforts earned the department the moniker, "Department of Reasonable Attempts."  (*Id.* ¶ 293.)  Likewise, Omnicare does not sue over such debts[6] and accepts nominal payments purely for appearance's sake.  (*Id.* ¶ 288.)  Ultimately, Omnicare would only write off National Account debts in the event that they became "inescapably unenforceable," such as when a customer filed for bankruptcy.  (*Id.* ¶ 289.)

Indeed, the SNFs designated "National Accounts" had it particularly good.  Not only would their debts not be collected, the National Accounts would also receive "such perks as free

---

[5] Relator alleges that, "while federal regulations prohibit providers (such as nursing homes) from steering patients to particular pharmacies for the sake of profit, and while the choice theoretically belongs to patients, for all practical purposes it is still nursing homes that elect the pharmacy that will serve their residents."  (Doc. No. 97 ¶ 283.)

[6] This is one allegation that Defendants have already contested.  Lengthier discussion follows below.

6

pharmaceuticals and expedited refunds in order to keep existing business or regain lost business." (*Id.* ¶ 291.)  Even where a National Account's debt reached into the six- or seven-figures, Omnicare did not terminate or suspend its services, fearing that if it did, it would lose the revenue it derived from serving that customer's Medicaid/Medicare Part D patients.  (*Id.* ¶ 292.)  By way of example, Relator notes that, by January 2008, Almaden Care, owned by Family Senior Care, owed more the $468,000, but instead of requesting that Almaden Care pay down its debt, Omnicare allowed over the next several months the past-due balance to swell to greater than $500,000.  (*Id.* ¶ 292.)

As another example, Grant Park, a facility run by Shoreline HealthCare Management, and one of Omnicare's National Accounts, owed more than $1.1 million dollars by June 2008, but the KAM in charge of the facility argued against trying to collect, in light of Omnicare's ongoing attempts to acquire the business of related facilities.  (*Id.* ¶ 295.)  By September 2008, Grant Park's debt had grown to $1.2 million.  (*Id.* ¶ 295.)

The effect of Defendants' scheme was that the SNFs would receive "free Part A drugs in exchange for allowing Omnicare to keep and expand the number of facilities to which it provides drugs and services."  (*Id.* ¶ 283.)  Given the relative sizes of Omnicare's Medicare Part A business and its Medicare Part D business — Medicaid business prior to 2006 — it made good business sense for Omnicare to forgive the former to grow the latter.  (*Id.* ¶ 291.)  The problem, at least according to Relator, was that doing so was illegal.

## II.    LEGAL STANDARD

### A.  Motion to Dismiss for Failure to State a Claim

A court may dismiss a complaint for a "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a Rule 12(b)(6) motion to dismiss, a complaint

'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief — including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   That is, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).   A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).   The plausibility standard "is not akin to a 'probability requirement,'" though it does require more than simply a "sheer possibility" that a defendant has acted unlawfully.  *Id.*  Thus, a pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff.   The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 556 U.S. at 678-79 (citation omitted).   The court should not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'"  *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).   A court may consider the contents of the pleadings, including attachments thereto, as well as documents attached to the motion, if they are referenced in the plaintiff's complaint and are central to the claims.   *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

Importantly, the court should not evaluate the merits of the allegation, but must satisfy itself only that the plaintiff has adequately pled a legally cognizable claim.  *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

### B. Rule 9(b)

Federal Rule of Civil Procedure 9(b) requires that a party "alleging fraud or mistake . . . state with particularity the circumstances constituting fraud or mistake."  Rule 9(b)'s particularity requirement "has long played [a] screening function, standing as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later."  *United States ex rel. Grubbs v. Kannegani*, 565 F.3d 180, 185 (5th Cir. 2009).  Complaints alleging a violation of the False Claims Act come within the auspices of Rule 9(b).  *Id.*

The traditional understanding of the rule is that, "[t]o plead fraud with particularity a plaintiff must include the 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" *United States ex rel. Russell v. Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 308 (5th Cir. 1999) (quoting *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)), *abrogated on other grounds by United States ex rel. Eisenstein v. City of New York, New York*, 556 U.S. 928 (2009). But the Fifth Circuit has held that "the 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b)," and that imposing such requirements is more sensible in the context of common law and securities fraud claims, which require showing reliance and damages.  *Grubbs*, 565 F.3d at 189-90.  Because the False Claims Act demands a different ultimate showing, the court of appeals has fashioned "a workable construction of Rule 9(b)," one designed to "effectuate[]" the Rule's purpose "without stymieing legitimate efforts to expose fraud."  *Id.* at 190.  Thus, "to plead with particularity the circumstances constituting fraud for a False Claims

Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *Id.*  As for the False Claims Act's *mens rea* requirement, that "may be alleged generally."  Fed. R. Civ. P. 9(b).

In the main, Relator and Defendants agree that *Grubbs* sets forth the relevant interpretation of Rule 9(b).  (*Compare* Doc. No. 120 at 33-34 *with* Doc. No. 137 at 28.)

## III.    OMNICARE'S MOTION TO DISMISS

### A.  31 U.S.C. § 3729(a)(1) (former)/31 U.S.C. § 3729(a)(1)(A)(current)

As introduced above, the False Claims Act subjects to civil liability "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729 (a)(1)(A).[7]  The Fifth Circuit has "summarized that to state a claim under the FCA, a plaintiff must allege: (1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that is presented to the Government."  *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 (5th Cir. 2010) (citing *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009)).

The most straightforward FCA claims arise when a claimant requests compensation for services which he has not performed, or overcharges for those that he has completed.  *See United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 662 (S.D. Tex. 2013) (citing, e.g., *United States ex rel. El-Amin v. George Wash. Univ.*, 522 F. Supp. 2d 135, 141 & n. 5

---

[7] Prior to the 2009 amendments to the FCA, the relevant provision was § 3729(a)(1), which applies to "any person who . . . knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval."

(D.D.C. 2007); *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.,* 190 F. 3d 1156, 1164 (10th Cir. 1999)).   But there also exists another variety of FCA claim.   "Under some circumstances, accurate claims submitted for services actually rendered may still be considered fraudulent and give rise to FCA liability if the services were rendered in violation of other laws." *Id.* (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp*., 125 F.3d 899, 902 (5th Cir. 1997)).   The Fifth Circuit has explained that, "where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *Thompson*, 125 F.3d at 902.  In such cases, "a defendant's violation of a law on which the government conditions payment may serve as a 'predicate' violation that invokes FCA liability." *Parikh*, 977 F. Supp. 2d at 662.

The criminal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), is one such law. The AKS makes illegal "knowingly and willfully solicit[ing] or receiv[ing]" or "offer[ing] or pay[ing]"

> any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . . (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

*Id.* § 1320a-7b(b)(1)(A)-(B).  In other words, "[t]he Medicare anti-kickback statute prohibits (1) the solicitation or receipt of remuneration in return for referrals of Medicare patients, and (2) the offer or payment of remuneration to induce such referrals." *Thompson*, 125 F.3d at 901.  When it forms the basis of an FCA claim, an AKS violation must be pleaded with particularity.  *See*

*United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 894 (5th Cir. 2013) (per curiam).

It is now the case, thanks to one of the lesser-known provisions of the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 111-148, § 6402(f), 124 Stat. 119, 759 (2010) that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of" the FCA, regardless of whether other criteria, like certification, are satisfied. 42 U.S.C. § 1320a-7b(g). The parties here — or, more specifically, the United States as interested non-party and Defendants — dispute whether that was true when the events underlying this case took place. The United States urges that the PPACA amendment to the AKS merely codified pre-existing law; Defendants contend that, prior to the amendment, an AKS violation could only serve as a predicate to an FCA claim in the event that the claimant had certified compliance with the AKS. For reasons that will become clear below, the Court need not ultimately resolve that dispute.

Thus, in light of the applicable law and the arguments made by Defendants in support of dismissal, the Court answers the following questions in turn:

(1) whether Relator has alleged a violation of the AKS;

(2) whether Relator has sufficiently alleged certification of compliance, or, if not, whether she was not in fact required to do so; and

(3) whether Relator alleged the details of an actually submitted false claim, or, if not, whether she has alleged particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.

### 1. *Whether Relator Has Alleged an AKS Violation*

Defendants make several AKS-specific arguments as to why Relator's Complaint should be dismissed for failure to state a claim. First, they argue that Relator "has not alleged that

Omnicare actually wrote off, or cleared the amounts due, never intended to collect the debt, or that any delay in collection was for the purpose of inducing a specific customer to give any Omnicare pharmacy Medicare Part D or Medicaid business."  (Doc. No. 120 at 24.)  Further, Defendants assert that, for three reasons, Relator has failed to comply with Rule 9(b) and plead the AKS violation(s) with particularity.  Defendants assert that Relator "fails to identify any referrals for business that Omnicare unlawfully obtained and billed to federal or state health programs as a result of alleged kickbacks," "does not sufficiently identify who allegedly violated the AKS because she does not adequately distinguish between the 211 named defendants that Relator has collectively defined as Omnicare," and "does not sufficiently identify when Omnicare's alleged scheme to violate the AKS took place."  (*Id.* at 35-36.)

      a.  <u>Challenges Sounding in Rule 12(b)(6)</u>

Defendants have failed to convince the Court that forgiven debt cannot be considered remuneration.  Courts have "interpreted the meaning of 'remuneration' broadly as 'anything of value in any form whatsoever,' reasoning that '[t]he Anti-Kickback Statute uses the term any remuneration, which suggests an expansive reading of the form of any kickback directly or indirectly, as opposed to a narrow reading.'"  *United States ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, No. 2:08-CV-00114, 2012 WL 628515, at *5 (S.D. Ohio Feb. 27, 2012) (quoting *United States ex. rel. Fry v. The Health Alliance of Greater Cincinnati*, No. 1:03–CV–001672008, 2008 WL 5282139, at *7 (S.D. Ohio Dec. 18, 2008)).  In *Fry*, the court relied on the *Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions*, 56 Fed. Reg. 35952, 35958 (July 29, 1991), which it read to be "unambiguous in offering a broad definition of the term 'remuneration' as 'anything of value in any form whatsoever.'"  *Fry*, 2008 WL 5282139, at *7.  Those regulations explain that "Congress's intent in placing the term

'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever" and that "[t]he statute's language makes clear that illegal payments are prohibited beyond merely 'bribes,' 'kickbacks,' and 'rebates,' which were the three terms used in the original 1972 statute."  56 Fed. Reg. at 35958.  Likewise, the regulations note that "[t]he statute's legislative history . . . makes clear that the fundamental analysis required of a trier of fact is 'to recognize that the substance rather than simply the form of a transaction should be controlling.'"  *Id.* (quoting 123 Cong. Rec. 30,280 (1977), Statement of Chairman of the House Committee on Ways and Means and principal author of H.R. 3, Representative Rostenkowski;  H.R. Rep. No. 393, part II, 95th Cong., lst Sess. 53; *reprinted in* (1977) U.S. Code Cong. & Ad. News 3056; S. Rep. No. 453, 95th Cong., lst Sess. 12 (1977)).

Against this backdrop, Defendants' argument that Omnicare would have had formally to write the debt off of its books in order for the forgiven balances to be considered remuneration appears dubious.  Unsurprisingly, then, the courts that have recently confronted similar factual scenarios have found that forgiven accounts receivable can amount to remuneration for AKS purposes.  In *United States ex rel. Fontanive v. Caris Life Scis., Inc.*, No. 3:10-cv-2237-P, slip op. at 23 (N.D. Tex. Oct 23, 2013),[8] the district court was confronted with a defendant that "declined to collect from client hospitals over a million dollars in bills" because "[i]t was afraid that issuing technical component bills would cause client hospitals to stop referring patients for Target Now services."  *Id.* at *23.  The court found the uncollected balances sufficient to constitute remuneration.  Similarly, in *United States ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, No. 2:08-CV-00114, 2012 WL 628515 (S.D. Ohio Feb. 27, 2012), the relator alleged that "Mobilex regularly chose simply not to collect its accounts receivable from the nursing

---

[8] Though the parties both cite it, the *Fontanive* case is curiously unavailable through the usual electronic databases and search engines.  A copy of the slip opinion is on file with the Court.

homes, effectively providing its services for free." *Id.* at *3. That court too found that relator had properly alleged an AKS violation. And, in *In re Pharm. Indus. Average Wholesale Price Litig.*, 478 F. Supp. 2d 164 (D. Mass. 2007), the court included "debt forgiveness" in a list of "special incentives" that, "if paid with corrupt intent, would be paradigm instances of behavior prohibited by anti-kickback legislation." *Id.* at 177.

This Court agrees. Precedent dictates that the Court's inquiry should be functional and not formal, and so it has little trouble concluding that, if Omnicare did in fact, with the requisite *mens rea*, forgo payments on accounts receivable, that debt forgiveness would constitute "remuneration." It is not enough for Defendants to argue that "Relator ignores all conceivable legitimate reasons for delay in collecting, including but not limited to contract payment terms, billing errors, and billing disputes." (Doc. No. 120 at 11.) Rather, Defendants will have a chance to show any one, or all of, those things as this case proceeds and can press those arguments when it comes time for summary judgment. The Court is likewise unmoved by Defendants' assertion that "Relator's allegation that Omnicare did not sue large accounts for overdue balances is demonstrably wrong." (*Id.* at 22 (citing Doc. No. 97 ¶ 282, 302).) Though the Court agrees that the mere existence of lawsuits against certain customers is judicially noticeable, *see Ferguson v. Extraco Mortgage Co.*, 264 F. App'x 351, 352 (5th Cir. 2007) (per curiam) ("A court may take judicial notice of 'a document filed in another court . . . to establish the fact of such litigation and related filings,' but generally cannot take notice of the findings of fact from other proceedings because those facts are usually disputed and almost always disputable." (quoting *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998))), the Court does not deem those lawsuits probative without digging deeper into, for example, the amounts in controversy and the degree to which those amounts comprised the total accounts

15

receivable that Omnicare was owed.   And *those* facts are not judicially noticeable.   That Omnicare sued for past-due balances may well become highly relevant down the road, but the Court is not yet prepared to alter its conclusion because of it.   It is convinced that Defendants' 12(b)(6) challenge to Relator's AKS allegations is without merit.

        b.   <u>Challenges Sounding in Rule 9(b)</u>

           i.   *Legal Standard*

Adequately analyzing Defendants' Rule 9(b) challenges requires taking a closer look at how that rule applies to Anti-Kickback Statute violations that serve as False Claims Act predicates.   There is no doubt that AKS violations come within Rule 9(b)'s ambit, and it is of course the general rule, that, while "[w]hat constitutes 'particularity' will necessarily differ with the facts of each case . . . [a]t a minimum . . . Rule 9(b) requires the who, what, when, where, and how to be laid out."   *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (internal quotation marks omitted), *opinion modified on denial of reh'g*, 355 F.3d 356 (5th Cir. 2003).   It is also true, though, that in the context of FCA claims, "if [Relator's Complaint] cannot allege the details of an actually submitted false claim," it "may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."   *Grubbs*, 565 F.3d at 190.   Yet, as the *Parikh* court recently noted, "though the *Grubbs* court relaxed the standard for pleading presentment of false claims . . . it did not relax the pleading requirements for alleging the existence of the more crucial element—the scheme."   *Parikh*, 977 F. Supp. 2d at 671.

The question remains, then, whether a relator must allege the "the who, what, when, where, and how" of each alleged kickback in order to allege with particularity the existence of a scheme to submit false claims that is grounded in the payment of kickbacks.   The Court believes

16

that doing so is not necessary, but a deeper dive is necessary to determine just what does satisfy Rule 9(b).

Parikh serves as a useful reference.  There, the court explained that "[t]o plead FCA liability predicated on AKS violations, Relators need only allege the particular details of a scheme to offer kickbacks in order to induce referrals."  *Parikh*, 977 F. Supp. 2d at 667.  Judge Costa considered Rule 9(b) challenges to the relator's complaint as it related to six different groups of physicians that referred patients to the defendant.  Where Judge Costa found "allegations that, if true, provide a strong inference of the existence of a kickback scheme," he allowed a claim to go forward.  *Id.* at 670.  He took a common sense approach to that inquiry, noting, for example, that with respect to one group of doctors, the inference that a kickback scheme existed "[wa]s particularly strong given that it would make little apparent economic sense for [defendant] Citizens to employ the cardiologists at a loss unless it were doing so for some ulterior motive — a motive Relators identify as a desire to induce referrals."  *Id.* at 670-71.

On the other hand, where Relator had "allege[d] two specific instances in which [a group of doctors] or their assistants made referrals in exchange for improper benefits," but "d[id] not explain how these incidents f[e]ll into a larger scheme or plan to violate the FCA," the *Parikh* court found the allegations insufficient.  *Id.* at 671.  The allegations regarding the scheme were deficient, with respect to that particular group of doctors, because "[t]he Court [wa]s left to speculate how the hospitalists [we]re receiving improper compensation, by what means Citizens [wa]s attempting to induce them to make referrals, or how Citizens [wa]s supposed to benefit from the referrals."  *Id.*  Without those details, the Court could not find Rule 9(b)'s particularity requirement satisfied.

The Court thus concludes that, to allege the particulars of a scheme to offer kickbacks, Relator must sketch how it was that Defendant provided remuneration to its clients, the form of that remuneration, how and why Defendant believed that remuneration would induce new business, and how Defendant benefited from the remuneration.  In keeping with Rule 9(b), Relator must allege the timeframe in which the scheme took place and which components of the Defendant organization were involved, even if she cannot allege the exact dates on which kickbacks were provided and the names of each individual within Omnicare who authorized a kickback.

This conclusion is bolstered by another line of precedent that "ha[s] . . . relaxed Rule 9(b)'s pleading standard where the alleged fraud occurred over an extended period of time and consists of numerous acts."  *United States ex rel. Foster v. Bristol-Myers Squibb Co.*, 587 F. Supp. 2d 805, 821 (E.D. Tex. 2008); *see also United States ex rel. Davis v. Lockheed Martin Corp.*, No. 4:09-CV-645-Y, 2010 WL 4607411, at *3 (N.D. Tex. Nov. 15, 2010) ("But in cases where the plaintiff is alleging that the fraud occurred over a period of years, the plaintiff is not required to allege all facts supporting every instance when the defendant engaged in fraud."); *United States ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 689, 697 (W.D. Tex. 2007) ("These pleading requirements are relaxed where the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge or when the alleged fraud occurred over a multi-year period."); *United States ex rel. King v. Alcon Labs., Inc.*, 232 F.R.D. 568, 570 (N.D. Tex. 2005) ("However, in cases where the plaintiff is alleging that the fraud occurred over a multi-year period, the plaintiff is not required to allege all facts supporting each and every instance when each defendant engaged in fraud."); *Thompson*, 20 F. Supp. 2d at 1039 ("Furthermore, Relator notes, courts have consistently found that where allegations of fraudulent conduct are

numerous or take place over an extended period of time, less specificity is required to satisfy the pleading requirements of Rule 9(b).”); *United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206-07 (E.D. Tex. 1998) (collecting cases).

Still, even where courts have adhered to a relaxed Rule 9(b) standard, they have not budged from the basic rule that the complaint must include a “sufficient factual basis for [Plaintiff/Relator’s] belief.” *Foster*, 587 F. Supp. 2d at 822. This can often take the form of a “representative sample” of the alleged wrongdoing. *United States ex rel. Bennett v. Boston Scientific Corp.*, No. CIV.A. H-07-2467, 2011 WL 1231577, at *17 (S.D. Tex. Mar. 31, 2011); *see also King*, 232 F. Supp. 2d at 572 (finding that, even under a relaxed pleading standard, relators failed to plead fraud with particularity because they did not identify a single person involved in the alleged fraud, did not point to specific fraudulent claims, and did not specify a single date on which fraudulent activity occurred); *Lam*, 481 F. Supp. 2d at 688 (finding that even under a relaxed pleading standard, relators’ complaint failed because they failed to name one physician who violated the anti-referral statute, did not specifically identify one fraudulent transaction, and alleged only that the fraudulent events occurred “at some point in the 1980s, between 1995 and 2002, and in 1999”).

Thus, in view of the Court’s understanding of how Rule 9(b) operates in the specific context of FCA claims predicated on AKS violations, Defendants’ Rule 9(b) challenges largely fail, for the reasons set forth below.

### ii.     *Whether Relator Has Alleged — Or Needed To Allege — Inducement*

In what could be characterized as a challenge to the “what” and the “how” of Relator’s allegations, Defendants argue that “Relator fails to allege that the forgiveness of any accounts receivable balance by any Omnicare entity caused any specific customer to give federal health

care business to that Omnicare entity."  (Doc. No. 120 at 21.)   Looked at another way, Defendants argue that Relator needs to have alleged that forgiving accounts receivable actually induced customers to send Omnicare new business.  But, as the *Parikh* court observed, "the AKS does not require actual inducement." *Parikh*, 977 F. Supp. 2d at 664.  Rather, "[t]he AKS's plain language thus makes it unlawful for a defendant to pay a kickback with the intent to induce a referral, whether or not a particular referral results." *Id.* at 665.

Nevertheless, Defendants can point to the Fifth Circuit's decision in *Nunnally*, 519 F. App'x 890, to contend that "actual inducement is an element of the AKS violation." *Id.* at 894. The *Parikh* court considered, and rejected, that argument.   The aforesaid language from *Nunnally*, the court explained, "appears at odds with both the language of the AKS and precedent applying that statute." *Parikh*, 977 F. Supp. 2d at 665.  The *Nunnally* quotation is at odds with the statutory language because "[t]he AKS's plain language . . . makes it unlawful for a defendant to pay a kickback with the intent to induce a referral, whether or not a particular referral results," *id.* (citing 42 U.S.C. § 1320a-7b(b)(2)(A)), and runs counter to precedent applying that statute because that "[c]ase law . . . consistently treats the AKS's inducement element as an intent requirement," *id.*

The *Parikh* court noted that the "actual inducement" quotation from *Nunnally* actually "turns out to be at odds with *Nunnally* itself." *Id.*  Rather, what *Nunnally* demanded that relator plead was "'that [the defendant] knowingly paid remuneration to specific physicians in exchange for referrals' — the commonly accepted understanding of the AKS's inducement requirement." *Id.* (quoting *Nunnally*, 519 F. App'x at 894).  What is more, as *Parikh* also noted, *Nunnally* is unpublished and therefore not binding. *Id.*

Thus, with respect to inducement, all that Relator must do is plead that Omnicare acted with the "intent to induce referral of federal health care program business." *United States v. Omnicare, Inc.*, No. 11-CV-8980, 2014 WL 1458443, at *9 (N.D. Ill. Apr. 14, 2014) (citing *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 675 (N.D. Ill. 2006); *Osheroff,* 2012 WL 2871264, at *8). The Court is satisfied that Relator has done so. For instance, the Complaint alleges that "[i]n exchange [for debt forgiveness], Omnicare chiefly expects, in addition to other opportunities, these [SNFs] to choose Omnicare as the pharmacy for their residents." (Doc. No. 97 ¶ 283.) More specifically, Relator has alleged that "Harborside Healthcare Corporation . . . received favorable treatment from Omnicare in an effort to retain its business" and that "Omnicare sought to gain the business of Harborside's newly acquired facilities." (*Id.* ¶ 294.) Similarly, Relator asserts that an Omnicare official argued against collecting from Grant Park, a facility affiliated with Shoreline HealthCare Management, "because Omnicare was attempting to acquire the business of related facilities." (*Id.* ¶ 295.) In the same vein, Relator alleged that "Omnicare's concern in protecting P-Holds and Regional Holds from Collections is with soliciting and retaining the lucrative Medicaid and Medicare Part D business." (*Id.* ¶ 298 (citing TAC Ex. 1).) Also probative, if a bit less so, is Relator's allegation that she sought to advise her superiors that Five Star Quality Care should be forced to pay its outstanding balance before being offered a new contract, but that she was told not to discuss Five Star's past due balance and informed that Omnicare was in the process of negotiating to buy Five Star's pharmacy business, a transaction that was indeed successfully consummated down the road.[9] (*Id.* ¶¶ 311-12.) Finally, Relator contends that she "once became so frustrated about the number of accounts

---

[9] Relatedly, Relator alleges that Omnicare's Chief Operating Officer "ordered her to cease all collection efforts at Five Star" because, "despite the size of Five Star's debt . . . Omnicare needed to 'tread lightly' because Omnicare was attempting to purchase pharmacies from Five Star." (Doc. No. 97 ¶ 324.)

accruing increasing debt . . . that she confronted her supervisor, Richard Richow.  He reminded her that Omnicare makes a great deal of money from the Medicaid (and, after January 1, 2006, Medicare Part D) beneficiaries at those facilities and said that Omnicare did not want to risk losing that income."[10]  (*Id.* ¶ 313.)  Read together, these allegations evince intent to induce new business sufficient to survive this Motion to Dismiss.

    *iii. Whether Relator Has Alleged "Who" Was Involved in Omnicare's Scheme*

   Defendants also challenge Relator's Complaint on the grounds that she "does not sufficiently identify who allegedly violated the AKS because she does not adequately distinguish between the 211 named defendants that Relator has collectively defined as Omnicare."  (Doc. No. 120 at 35-36.)  Relator counters that "[t]here is no doubt that Omnicare, Inc. perpetrated this scheme as a single business entity, sharing employees, offices, and business names with its individual pharmacies."  (Doc. No. 137 at 33 (citing Doc. No. 97 ¶ 315).)  Further, Relator explains that "Omnicare Inc.'s central organization . . . sets policies, dictating how each SNF nationwide is categorized and treated. . . . Thus, while Omnicare might comprise several small entities, collectively, Omnicare, Inc. is a culpable 'who' in this fraud.'"  (*Id.* (citing Doc. No. 97 ¶¶ 286, 288).)

   Relator also points to CEO Joel Gemunder as part of the "who."  She explains that "Gemunder took an active and aggressive part in curtailing the Credit and Collections department's ability to perform its most basic function: collect Omnicare's outstanding liability."  (Doc. No. 137 at 33.)  Relator alleged that National Accounts debts fell under the purview of Gemunder and his senior management team (Doc. No. 97 ¶ 288); that Gemunder (or another

---

[10] Relator alleges that this exchange continued with Relator exclaiming "But that's inducement!" and Richow agreeing and telling her that the Executive Director of Pharmacy for the New York region "would be the 'first to go to prison' over such an arrangement."  (Doc. No. 97 ¶ 313.)

specifically named Omnicare executive) "demanded that [Relator] cease collections efforts immediately" whenever she contacted a National Account (*id.* ¶ 308); and that Omnicare staffers were hesitant to ever try to collect from a large account "because they [would] then face a tongue-lashing or worse from Omnicare leadership, including then CEO Joel Gemunder" (*id.* ¶ 315). Whether these allegations would be enough to overcome Gemunder's Motion to Dismiss is a different matter; but in any event, they certainly help to establish who was involved in Omnicare's kickback scheme.

Additionally, Relator notes that she "isolated the beneficiaries of Defendants' kickbacks: Omnicare's National and P-Hold account-holders." (Doc. No. 137 at 34 (citing Doc. No. 97 ¶ 282).) She points to the aging spreadsheets, attached to her Complaint, that "identify[] each localized subsidiary as well as its preferred corporate owner by name." (Doc. No. 137 at 34.) And, she notes that she "isolated eight of Defendants' most favored SNFs and alleged specific examples of these SNFs' fraudulent conduct." (Doc. No. 137 at 34 (citing Doc. No. 97 ¶¶ 338-67).) Indeed, those paragraphs cited by Relator go into fairly significant detail about the conduct of Shoreline HealthCare Management, Five Star Quality Care, Harborside Healthcare/Sun Healthcare Group, Inc., Life Care Centers of America, Inc., Avamere Health Services, LLC, Family Senior Care, Millennium Management, LLC, and Fundamental Long Term Care Holdings, LLC/Trans Healthcare, Inc. These summaries included snapshots of total debts due at given times, a sense of how a National Accounts' debt increased over time, and illustrations of individual facilities that were particularly delinquent. (*See, e.g.*, Doc. No. 97 ¶¶ 339-42.)

In their reply, Defendants contend that, despite these allegations, Relator's Complaint fails because "none of these allegations identify the individual or individuals who were involved in implementing the alleged fraudulent scheme at issue." (Doc. No. 139 at 17-18.) That

contention, however, fails as a matter of fact and as a matter of law.  As to the former, Relator

has alleged the role that Gemunder and others on his senior management team played, and has

gone into some detail as to the role played by Michael Rosenblum, Executive Director of

Omnicare's New York subsidiary.  (Doc. No. 97 ¶¶ 297, 313, 314, 316.)  For instance, Relator

alleged that

> it was Rosenblum who expressly prohibited Ruscher and her staff from collecting
> on accounts in Rosenblum's New York region.  Rosenblum kept P-Holds on most
> of his accounts because he was afraid that any collection efforts would cause his
> customers to cease doing business with Omnicare. . . . Rosenblum also made
> unwritten settlement agreements with his customers that could not be enforced by
> Omnicare, presumably in an effort to appear as if he were collecting past-due
> amounts while appeasing his customers at the same time.  The amount owed by
> his customers was typically astronomical . . .

(*Id.* ¶ 314.)

As for the law, Defendants rely on two cases for the proposition that Relator needed to

plead the specific identities of those involved in Omnicare's kickback scheme.  First, in

*Thompson v. LifePoint Hospitals, Inc.*, No. CIV.A. 11-01771, 2013 WL 5970640 (W.D. La.

Nov. 8, 2013), the relator had alleged that Defendant "violated the [AKS] . . . by providing Dr.

Robert Craig, a non-employee physician, housing at less than the fair market rent as an incentive

to relocate to Ville Platte and refer patients under his care to Ville Platte Medical Center."  *Id.* at

*2.  The court held that, because relator had not "describe[d] when this supposed arrangement

began or ended or any details of the arrangement, *i.e.* how much rent was paid, what apartment

Relator is referring to, or who was involved in setting up the arrangement,"  relator had "fail[ed]

to meet the bar required by Rule 9(b)."  *Id.* at *5.  While the Court certainly understands why

Defendants cite to it, *LifePoint Hospitals* is only mildly persuasive.  The Complaint in *LifePoint*

*Hospitals* appears to have been so utterly devoid of crucial details that it does not seem possible

to extrapolate that, had more detailed information about "who" took part in the alleged kickback

been the only thing the Complaint was missing, it still would have failed under Rule 9(b).

Moreover, the Court distinguishes *LifePoint Hospitals* on the grounds that "who" can be viewed

differently in the context of a pervasive, company-wide scheme, as Relator has alleged in this

case, than when a single incident was alleged, as was true in *LifePoint Hospitals*.   It is only

natural that it will be harder to point to specific individuals when discussing a kickback scheme

that (allegedly) became, in essence, a part of the corporate culture.

The second case relied upon by Defendants is likewise unpersuasive.  In *United States ex*

*rel. Wismer v. Branch Banking & Trust Co.*, No. 3:12-CV-1894-B, 2013 WL 5989312 (N.D.

Tex. Nov. 12, 2013), the court determined that relator "ha[d] not alleged specific factual details

of a fraudulent scheme," though, importantly, *not* because relator had not pleaded enough about

who was involved.  *Id.* at *5.  As such, because relator could not avail himself of the *Grubbs*

'exception' to Rule 9(b), the Court determined that he needed to have pleaded "the who-what-

when-where-and-how" of actually submitted false claims.  *Id*.  And because relator had not

pleaded who submitted any false claims, the court granted defendant's motion to dismiss.  Thus,

all that *Wismer* stands for is that, where it is necessary to plead with particularity "who" did

something, relator must actually do so.  This unremarkable proposition does not move the Court.

In short, because it is the scheme that Relator must allege with particularity, not the

individual kickbacks, and in light of the *somewhat* relaxed pleading standard that applies to

allegations of long-running fraud, Relator has pleaded enough "who" to survive this Motion.

> iv.   Whether Relator Has Alleged "When" Omnicare's Scheme Took Place

Along the same lines, Defendants argue that Relator "does not sufficiently identify when

Omnicare's alleged scheme to violate the AKS took place."  (Doc. No. 120 at 36.)  Defendants

suggest that "Relator does not allege when anyone within Omnicare authorized the kickbacks,

when the alleged scheme began, or when any account balances were forgiven." (*Id.*) Defendants also point out that "[a]ll of her allegations regarding amounts due from certain customers at certain periods of time are based on exhibits dated between January and September 2008" and argue that "[s]uch allegations do not alert Omnicare to a sufficiently precise time frame to satisfy Rule 9(b)." (*Id.*) Relator counters that she "alleged that Omnicare's scheme dates from at least 1998 to the present" and that she "provided ample information to substantiate these dates, including specific details of events occurring before, during, and after her tenure." (Doc. No. 137 at 35.)

Neither party is quite right. Relator worked at Omnicare from July 2005 until August 2008. (Doc. No. 97 ¶ 304.) She points to e-mails discussing past-due bills sent in 2006 (Doc. No. 97 Ex. 8) and she specifically cites balances due between January and September 2008, (Doc. No. 97 ¶¶ 292-95). Relator's aging spreadsheets show numerous six- or even seven-figure debts that, in January 2008, had been due for at least nine months. (Doc. No. 137 at 35 (citing TAC Ex. 48).) And in her brief, she makes a compelling case for why many of those balances accrued over some time — not less than 180 days, but in at least some cases, much longer. For example, she identifies a facility that, by January 2008, had accrued more than $1.1 million in debt older than nine months, and because that facility's average bill was less than $51,000 per month, she surmises that the outstanding debt represented at least two years of unpaid bills. (Doc. No. 137 at 35.) Having reviewed the aging spreadsheets attached to the TAC as exhibits, the Court has no trouble inferring that the balances due accrued over extended time periods. And, as Relator points out, courts have agreed that a relator's termination does not necessarily evince that a scheme has come to an end — especially a scheme like this, where balances grow at a somewhat predictable pace — and so the Court does not feel compelled to throw out all

26

allegations that took place after Relator's departure from Omnicare.  *See United States v. Medtronic, Inc.*, No. 95-1236-MLB, 2000 WL 1478476, at *3 (D. Kan. July 13, 2000) ("[Relator] was subsequently terminated in August 1994.  A reasonable temporal scope of discovery, absent other justification, is January 1990 to January 1995."); *see also Strom ex rel. United States v. Scios, Inc.*, 676 F. Supp. 2d 884, 895 (N.D. Cal. 2009) ("Subsequent attempts [to] shift course on their own do not absolve Defendants for earlier allegedly fraudulent activity.").

The Court is therefore convinced that Relator has satisfied Rule 9(b)'s particularity requirement for allegations of kickbacks that took place between 2005 and 2008.  But the leap from that three-year period to "1998 to the present" is remarkable, and ultimately unsupportable. The only references in the TAC to "1998" appear in her short renditions of why Defendants have violated state false claims acts and are entirely conclusory in nature.  (*See, e.g.*, Doc. No. 97 ¶ 459 ("Omnicare and/or the SNF Defendants knowingly violated Cal. Gov't Code § 12651(a) from at least 1998 to the present . . .").)  In contrast, virtually every occurrence recounted in the "Factual Allegations" section of the TAC took place between 2005 and 2008.  (*See, e.g.*, *id* ¶¶ 277-289, 292, 294, 298.)  The Court can see no particularized basis whatsoever for the assertion that Defendant's scheme began as early as 1998 or continued past the close of 2008.  Indeed, it is hard to distinguish the instant case from *Sealed Appellant I v. Sealed Appellee I*, 156 F. App'x 630 (5th Cir. 2005), in which the Fifth Circuit explained that, "the complaint alleges that on or about August 31, 2001, Appellant was fired, but does not allege how Appellant knows that Appellee submitted false billing statements after that time. . . . [T]he allegations of fraud outside of that time frame are based on Appellant's extrapolations and good faith belief; this is simply not sufficient under Rule 9(b)."  *Id.* at 633 (citing *Columbia/HCA Healthcare*, 125 F.3d at 903).

It would appear that, here too, Relator relies on nothing more than extrapolation and good faith belief, and that is not enough.

The cases that Relator cites for the proposition that "courts have often recognized that a scheme does not begin or end with the relator's employment" support limiting this case to those claims arising out of kickbacks paid between 2005 and 2008, not 1998 to the present.   In *Medtronic, Inc.*, 2000 WL 1478476, the court determined that, though relator had asked for discovery covering a twenty-year period, because the "complaint allege[d] that [relator] first observed the alleged misconduct when he relocated to Wichita as a Medtronic sales representative in October 1991" and "was subsequently terminated in August 1994," "[a] reasonable temporal scope of discovery, absent other justification, is January 1990 to January 1995."  *Id.* at *3.  The Court takes from that decision that allegations of fraudulent conduct on a certain day can provide the particularized basis to believe fraud also occurred shortly before or shortly after, but not to extrapolate that fraud occurred whenever, and for as long as, relator might baldly claim — at least not without "other justification."  And no "other justification" has been offered here.

*Strom* is a more instructive decision.  To simplify the allegations a bit, the United States alleged in *Strom* that defendant Scios "encourage[ed] a use of [a] drug that was not authorized by the FDA — an "off-label" use.  676 F. Supp 2d. at 887.  That "reckless" promotion "caused doctors to submit claims for treatment that were not reasonable and necessary, and hence were not eligible for reimbursement under Medicare."  *Id.* at 890.  Although the complaint acknowledged that the improper promotional activities terminated in July 2005, the court declined to dismiss allegations of false claims submitted thereafter, because "the broader

allegations suggest[ed] that the only reason *any* doctor prescribed [the drug] was because of Defendants' earlier promotion." *Id.* at 894.

As this Court reads it, *Strom* stands for the proposition that, where predicate acts are committed during one time period, but necessarily lead to false claims being presented outside that time period, the later-presented false claims should not be disallowed merely because relator has not alleged predicate acts occurring around the same time. *Id.* at 894-95. Applied to the facts of this case, *Strom* dictates that, even if Relator cannot adequately allege kickbacks occurring after 2008, it may well be the case that false claims arising out of kickbacks she has pleaded with particularity were not submitted to the Government until a later time. The Court cannot yet make that determination.

In view of the foregoing, the Court therefore grants the Motion to Dismiss as to claims arising out of kickbacks paid before January 1, 2005 and after December 31, 2008. The Court acknowledges that its analysis of *Strom* leads to a conclusion more about presentment than about AKS violations. Thus, put in the language of presentment, as discussed below, the Court believes that Relator has pleaded with particularity AKS violations that took place between 2005 and 2008, and that so pleading gives rise to "reliable indicia leading to a strong inference that claims were actually submitted" after 2008. *Grubbs*, 565 F.3d at 185-86; *cf. United States ex rel. King v. Solvay S.A.*, No. CIV.A. H-06-2662, 2013 WL 820498, at *4 (S.D. Tex. Mar. 5, 2013) (undertaking a similar analysis of Strom but finding that "Relators did *not* provide any reliable indicia that lead to a strong inference that claims were actually submitted after [certain] dates" (emphasis added)). But because the Court can only draw an inference, it is possible that the Court may reach a different conclusion at the summary judgment stage.

*2.   Whether Relator Has Alleged Certification*

As introduced above, "the general rule is that a defendant's violation of a separate law can serve as a predicate to FCA liability only when 'the government has conditioned payment of a claim upon a claimant's certification of compliance with' that law, and the claimant 'falsely certifies compliance with that statute or regulation.'" *Parikh*, 977 F. Supp. 2d at 663 (quoting *Thompson*, 125 F.3d at 902); *see also LifePoint Hospitals*, 2013 WL 5970640, at *5 ("A violation of the AKS can serve as the basis for a FCA claim when the Government has conditioned payment of a claim upon the claimant's certification of compliance with the statute, and the claimant falsely certifies compliance.").

To satisfy this requirement, Relator relies upon "specific express certifications of compliance with the AKS accompanying Medicare enrollment forms and provider agreements and Medicare/Medicaid cost reports." (Doc. No. 137 at 23.) Indeed, the TAC is chock full of allegations of false certification. Relator has specifically referenced each of these documents (*see, e.g.*, Doc. No. 97 ¶¶ 245-46, 391, 394, 397, 403), and has alleged in more general terms the identities of the entities making the certification (*see, e.g.*, *id.* ¶ 245 ("To participate in Medicare, providers such as pharmacies, Omnicare included, and pharmacists, must sign enrollment agreements."); *id.* ¶ 391 ("Each of Omnicare's skilled nursing facility customers, including the Skilled Nursing Facility Defendants, has submitted . . .")). As just one example, Relator has pleaded that "Medicare and Medicaid require skilled nursing facilities, including but not limited to, the SNF Defendants named in this complaint, to submit regular, detailed cost reports accounting for their assets, transactions, and costs." (*Id.* ¶ 246.) She alleges that the form used to make cost reports contains certification language stating that "if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or

were otherwise illegal, criminal, civil, and administration action, fine and/or imprisonment may result." (*Id.*)  Further, Relator points out that a signatory for the entity submitting the cost report had to "certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." (*Id.*)  Later, Relator alleges that Omnicare does in fact submit, or cause to be submitted, cost reports containing certifications of compliance. (*See, e.g.*, *id.* ¶¶ 382, 388.)

There is an important distinction to be drawn between enrollment agreements and cost reports.  Defendants contend that forward-looking promises to comply cannot amount to false certifications and that Medicare and Medicaid Enrollment Agreements only contain forward-looking promises.

### a.   Whether Certifications Contained in Enrollment Agreements Suffice

There is little serious debate as to whether the certifications contained within enrollment forms amount to promises to comply in the future.  As the Court reads Relator's recitation thereof, they do.  Relator alleges that Medicare Enrollment Agreements require that providers "certify that they understand that 'payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with . . . the Federal anti-kickback statute.'" (*Id.* ¶ 245.)  Medicaid Enrollment agreements, Relator avers, generally take a similar form. (*Id.* ¶¶ 250-77.)

As for whether their forward-looking nature disqualifies those certifications from serving as the "false certifications" necessary to state a FCA claim, the case law is not abundantly clear.  At least two courts within this district have permitted the use of enrollment agreements.  Most recently, the *Parikh* court sanctioned the use of "Medicare enrollment applications." *Parikh*, 977

F. Supp. 2d at 664.   It did not address the prospective nature of the certification contained therein.   Another court authorized reliance on enrollment agreements, provided that, "at the time [the promise] was made the promisor had no intent to perform it."   *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1036 (S.D. Tex. 1998). The Court believes this issue demands greater scrutiny than the *Parikh* court applied.   Further, it is wary of stretching the TAC so far as to read it to include an allegation that Defendants never intended to keep the commitments made in the enrollment forms.   Accordingly, it cannot rely solely on *Parikh* or *Thompson* in allowing claims premised upon certifications contained within enrollment agreements to move forward.

The Eleventh Circuit in *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256 (11th Cir. 2005) held that enrollment forms sufficed.   It explained that failure to comply with the certification therein "disqualified [defendants] from receiving payment as part of a Medicare program" and that, "[w]hen a violator of government regulations is ineligible to participate in a government program and that violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the Act, for its submission of those false claims."   *Id.* at 1259.   Defendants here attempt to distinguish *McNutt* on the grounds that "there is no allegation in this case that Omnicare has ever been disqualified from participating in the Medicare program" (Doc. No. 139 at 12), assuming that one's disqualification from the program must be the result of an official determination by the Government.   But there was no allegation of that sort in *McNutt*, either; rather, the Eleventh Circuit seemed to assume that violators of government regulations are automatically disqualified from future participation, regardless of whether the government intervenes and formally disqualifies them.   Relying on *McNutt*, the court in *United States ex rel. Osheroff v. Tenet*

*Healthcare Corp.*, No. 09-22253-CIV, 2013 WL 1289260 (S.D. Fla. Mar. 27, 2013) reached the same result.  It explained that defendant's "promise to comply with the Anti-Kickback Statute . . . didn't merely gain Tenet entrance into the Medicare program; its promise was also a 'prerequisite [ ] and the *sine qua non* of federal funding.'"  *Id.* at *4 (quoting *United States ex. rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006)).  The *Osheroff* court added that, "[i]f that weren't the case, and Tenet's promise of future compliance was nothing more than just that — a promise that didn't affect Tenet's standing to seek payment from Medicare — healthcare providers like Tenet 'would be virtually unfettered in [their] ability to receive funds from the government while flouting the law.'"  *Id.* (quoting *Hendow*, 461 F.3d at 1176.)

Several courts have read *McNutt* as endorsing an implied false certification theory.  *See, e.g.*, *United States ex rel. Freedman v. Suarez-Hoyos*, 781 F. Supp. 2d 1270, 1278 (M.D. Fla. 2011).  That theory would hold more or less that, in signing the enrollment agreement, a provider both promises ongoing compliance with the AKS and is put on notice that future payments are conditioned on keeping that promise.  As a result, when the provider subsequently seeks payment, it is implicitly certifying that it kept that promise to comply with the AKS.  As the Fifth Circuit has put it, "[t]he implied-certification theory of liability under the FCA 'is based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment.'"  *Steury*, 625 F.3d at 268 (quoting *Mikes v. Straus*, 274 F.3d 687, 699 (2d Cir. 2001)); *see also Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) ("Implied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not

required in the process of submitting the claim."). The implied-certification theory has been adopted, in at least some form, by a majority of the federal courts of appeals. *See Mikes*, 274 F.3d at 699-700 (Second Circuit); *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 306 (3d Cir. 2011); *United States ex rel. Augustine v. Century Health Servs., Inc.,* 289 F.3d 409, 415 (6th Cir. 2002); *Ebeid*, 616 F.3d at 996-98 (Ninth Circuit); *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008); *McNutt*, 423 F.3d at 1259 (Eleventh Circuit); *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266, 1269 (D.C. Cir. 2010).[11]

But the Fifth Circuit has not yet chosen a side. *See Steury*, 625 F.3d at 268-69. In this Court's opinion, there is good reason for it to embrace the implied false certification theory. As the Third Circuit explained when it opted to do the same, the implied false certification theory "gives effect to Congress' expressly stated purpose that the FCA should 'reach all fraudulent attempts to cause the Government to pay [out] sums of money or to deliver property or services,'" *Wilkins*, 659 F.3d at 306 (quoting S. Rep. No. 99-345, at 9 (1986), *reprinted in* 1986

---

[11] There is not a black-and-white circuit split here, but there certainly exists more than one analytical approach. Whereas the Second Circuit has held that "implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid," *Mikes*, 274 F.3d at 700, the Tenth and D.C. Circuits have acknowledged that conditions contained within an underlying contract between a service provider and the Government can give rise to implied false certification liability, *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 533 (10th Cir. 2000); *see also Sci. Applications Int'l Corp.*, 626 F.3d at 1269. What is more, the First Circuit has apparently declined to adopt the term "implied false certification," but has embraced the Tenth/D.C. Circuit rule. *See United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 393 (1st Cir. 2011). In fact, the *Hutcheson* court reached that conclusion in the course of holding that the Medicare "Provider Agreement is also sufficiently clear to establish that the claims submitted by *physicians* represented that the underlying transactions did not involve kickbacks to physicians prohibited by the AKS." *Id.* (alteration in original). Finally, the Fourth Circuit has yet to rule the implied certification theory in or out, but has discussed it with some skepticism. *See United States ex rel. Herrera v. Danka Office Imaging Co.*, 91 F. App'x 862, 864 (4th Cir. 2004).

U.S.C.C.A.N. 5266, 5274)) and it finds support in the language and structure of the Act, *id*.  In fact, "the text of the FCA does not exhibit an intent to limit liability in" the manner Defendants here suggest.  *Hutcheson*, 647 F.3d at 387.  And while the Court is mindful that the implied false certification theory should not be stretched too far, it supports allowing the implied false certification theory in cases such as this one.  Defendants are alleged to have signed a document that states in no uncertain terms that payment of future claims is conditioned upon compliance with the AKS.  That document made clear that compliance was "a *sine qua non* of receipt of state funding."  *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996).  Thus, where, like here, it is fairly apparent from the face of the complaint that "if the Government had been aware of the defendant's violations of the Medicare laws and regulations that are the bases of a plaintiff's FCA claims, it would not have paid the defendant's claims," *Wilkins*, 659 F.3d at 307, application of the implied false certification theory would not unduly expand FCA liability or do violence to the Act's text, structure, or purpose.

Thus, because the Court is persuaded that adopting the implied false certification theory is appropriate in the circumstances presented by this case — other courts have found that the language found in the enrollment agreements "comports with even the most parsimonious application of the implied certification theory," *United States ex rel. Pogue v. Diabetes Treatment Centers of Am.*, 565 F. Supp. 2d 153, 159 (D.D.C. 2008) (internal quotation marks omitted) — the Court denies the motion to dismiss as to claims arising out of certifications contained in enrollment agreements.  The Court finds the legion of cases endorsing the use of enrollment agreements and embracing the application of an implied false certification theory more persuasive than the three Northern District of Illinois cases that Defendants cite for the proposition that forward-looking promises can never qualify as false certifications.  *See United*

*States ex rel. Kennedy v. Aventis Pharm., Inc.*, 610 F. Supp. 2d 938, 946 (N.D. Ill. 2009); *United States v. Ukranian Vill. Pharmacy, Inc.*, No. 09 C 7891, 2013 WL 5408573, at *4 (N.D. Ill. Sept. 26, 2013); *United States ex rel. Wildhirt v. AARS Forever, Inc.*, No. 09 C 1215, 2011 WL 1303390, at *5 (N.D. Ill. Apr. 6, 2011).

Still, wary of the adage that bad facts make bad law, and because the Court here embraces a theory of liability that has not yet been sanctioned by the court of appeals, upon the development of a more complete factual record, the Court is willing to reconsider this segment of its ruling.

### b.  Whether Certifications Contained in Cost Reports Pass Muster

As for certifications contained within cost reports, the Court has much less trouble finding them sufficient.  Relator points to *Parikh* for that proposition, and for good reason. There, the court denied dismissal, for failure to allege false certification, of a complaint not materially different from the TAC.  In *Parikh*, Defendants had argued that dismissal was compelled by *Nunnally*, 519 F. App'x 890, in which relator's only certification-related allegation was that defendant "periodically either certif[ied] in writing or impliedly certif[ied] to the Medicare program that it complied with all of Medicare's program rules, regulations and laws applicable thereto."  *Id.* at 894.  In fact, Nunnally conceded that "he ha[d] *no knowledge* of any expressed certification by WCCH."  *Id.* at 894 n. 6 (emphasis in original).  The *Parikh* court rejected defendant's comparison to *Nunnally* and held that "[t]he complaint provides extremely detailed allegations concerning how Citizens allegedly certified its compliance with the AKS." *Parikh*, 977 F. Supp. 2d. at 664.  Parikh had alleged that defendants

> CMC and Brown falsely certified in the CMS annual cost reports in 2006, 2007,
> 2008, 2009, 2011, and 2012, that the services identified in the reports were
> provided in compliance with such laws and regulations, including the Anti-

Kickback and Stark Acts, despite knowing at the time that they were violating the Anti-Kickback and Stark Acts.

(Doc. No. 49 ¶ 20 in Case No. 6:10-cv-00064.)  Likewise, the *Parikh* complaint asserted that

To conceal their unlawful conduct and avoid refunding payments made on these false claims, CMC and Brown also knowingly and falsely certified to the Government in 2006 through 2013, in violation of the FCA, that the services identified in their CMS annual cost reports were provided in compliance with federal law, including the prohibitions against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians. The false certifications, made with each annual CMS cost report submitted to the Government between 2006 and 2013, were part of CMC and Brown's unlawful scheme to defraud Medicare and other governmental healthcare programs and circumvent the Anti-Kickback and Stark Acts.

(*Id.* ¶ 65.) Other than listing one-by-one the years in which false certifications were made — and the Court does not believe that doing so is particularly illuminating for *annual* cost reports, which ostensibly are filed each year — the *Parikh* complaint seems to have offered little more than that which is operative here.[12]

The Court acknowledges that there remain unanswered questions regarding whether the (allegedly false) certifications at issue were in fact conditions of payment and that, at first blush, these seem to be questions of law ripe for disposition on a motion to dismiss. But Fifth Circuit precedent dictates otherwise. In *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470 (5th Cir. 2012), the Fifth Circuit rejected the Government's assertion that "the district court erred in treating the question of whether the cost reports were a condition of payment as a question of fact," *id.* at 476 n.6, noting that in *Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, the court "den[ied] defendants' 12(b)(6) motions as they relate to this issue and remand[ed] to the district court for further factual development." *Id.* at 903. It may well be that, in the final

---

[12] It is true that Relator does not allege who signed each and every certification document, but that is less important here, where the scheme has pervaded the organization and occurred over a lengthy period of time.

analysis, "cost reports" and other certifications relied upon by Relator "present a difficult basis for FCA liability," *Gonzalez*, 689 F.3d at 475 (5th Cir. 2012),[13] but the Court is not convinced that Relator has failed to state a claim upon which relief can be granted or that Complaint fails to comport with Rule 9(b)'s particularity requirement.[14]

### 3.   Whether Relator Has Alleged Presentment

As the Court sought to make clear above in its explication of Rule 9(b), Relator "must also establish that claims rendered fraudulent by an underlying AKS violations were 'presented to the Government.'" *Parikh*, 977 F. Supp. 2d at 665 (quoting 31 U.S.C. § 3729(a)(1)(A-C)). As the court noted in *Parikh*, "*Grubbs* establishes that Relators need not identify particular claims resulting from the kickback scheme." *Id.* (quoting *Grubbs*, 565 F.3d at 190).  That is because "requiring a relator to plead the 'exact dollar amounts, billing numbers, or dates' prior to discovery . . . would be 'significantly more than any federal pleading rule contemplates.'" *Id.* (quoting *Grubbs*, 565 F.3d at 190).  Instead, "[a]s long as Relators plead with particularity that [Defendants] made kickbacks with the intent of inducing referrals, and they plead 'particular details of a scheme . . .  paired with reliable indicia that lead to a strong inference that claims were actually submitted,' the separate elements of the AKS and FCA are satisfied." *Id.* (quoting *Grubbs*, 565 F.3d at 190).

The Court here is persuaded by Relator's argument that "this fraud is built around the unique Medicare and Medicaid reimbursement structures in place in SNFs, which are dominated

---

[13] On the other hand, as the First Circuit has noted, the language of the cost reports "makes it abundantly clear that AKS compliance is a precondition of Medicare payment." *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 393 (1st Cir. 2011).

[14] The Court does not reach the Government's more adventuresome contention, that "[w]hen the government has made clear that payment is conditioned upon certain requirements, a claim for goods or services that do[es] not comply with those criteria is 'false' regardless of what certifications are made in conjunction with that claim."  (Doc. No. 135 at 13.)

by such enrollees.  Stated differently, the kickbacks exist *as a result* of the SNFs' tender of claims and Omnicare's failure to collect the Part A funds."  (Doc. No. 137 at 40.)  Put yet another way, "because the scheme executed is specific to government programs, there can be no doubt of the Government's injury."  (*Id.*)  Where the underlying allegation is that Omnicare forgives debts related to one government program in order to win business arising out of another government program, the obvious implication is that false claims will be submitted, as Relator has alleged.  (*See* Doc. No. 97 ¶¶ 409-425.)  The rest of the scheme, which has been sufficiently alleged, would make no sense at all without presentment of false claims.  As a result, those allegations (discussed above) are sufficient to provide reliable indicia of false claims, and the Complaint may proceed.

## B.  31 U.S.C. § 3729(a)(2) (former); 31 U.S.C. § 3729(a)(1)(B) (current)

Relator has also brought a claim under the former 31 U.S.C. § 3729(a)(2), which has been recodified as § 3729(a)(1)(B), and which prohibits "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." Defendants have not independently argued for dismissal of this claim, and the Court does not see how it could fail if the aforementioned claims brought under the former § 3729(a)(1) succeed. Consequently, to the extent Defendants have moved to dismiss this claim, that Motion is likewise **DENIED**.

### C.  Retaliation (31 U.S.C. § 3730(h))

#### 1.  Relevant Factual Allegations

In her role as Omnicare's collections manager, Relator[15] gained extensive knowledge of the hefty balances that were often past due.  (Doc. No. 97 ¶¶ 283, 287-99, 304-16.)  She has alleged that she reported what she had discovered to her supervisor, Richard Richow, and that he "reminded her that Omnicare makes a great deal of money from the Medicaid . . . beneficiaries at those facilities and said that Omnicare did not want to risk losing that income."  (*Id.* ¶ 313.)  Further, when Relator expressed her unqualified reservations — "But that's inducement!" — Richow agreed and remarked (the Court assumes glibly) that Omnicare's Executive Director of Pharmacy in New York would be the "first to go to prison."  (*Id.*)  In a separate incident, Relator met with pharmacy managers and "explained that intentionally failing to collect amounts due for pharmaceuticals and services provided to Medicare Part A beneficiaries constituted illegal inducement."  (*Id.* ¶ 316.)   Ruscher says that, "[i]n repeatedly warning her superiors that Omnicare was engaged in fraudulent activity, Ruscher did not mince words."  (*Id.* ¶ 322.)

If it had not begun sooner, Relator's fall from grace within Omnicare certainly began in earnest in June 2008.  During that month, Relator asked one national account, Five Star, to pay its debts.  (*Id.* ¶ 324.)  Omnicare's COO directed her to halt her collections efforts and instructed her to "tread lightly" as Omnicare sought to purchase other Five Star pharmacies.  (*Id.*)  Soon thereafter, on July 1, Relator was transitioned to a new role within the organization, becoming the National Litigation Manager.  (*Id.* ¶ 325.)  In that role, she sought to keep track of how much Omnicare was spending on collections-related litigation, but was quickly informed by David Gemunder, son of Omnicare CEO Joel Gemunder and a partner at Omnicare's outside counsel,

---

[15] As to her retaliation claim, Relator is more accurately considered a Plaintiff, as she is pressing it on her own behalf, but for the sake of consistency, the Court will continue to use "Relator."

that she did not need such information.  (*Id.* ¶ 325.)  A week or so later, attorneys from another

firm approached Relator, told her that "they had been hired by Omnicare's in-house counsel to

find the 'disconnect' between Ruscher and its national counsel," and "interrogate[d] Ruscher

regarding a seemingly random selection of her past actions."  (*Id.* ¶¶ 326-27.)  At a later meeting

held in Las Vegas, those attorneys insinuated to Relator that they believed she was having an

affair with an attorney she had hired to conduct collections, leaving her "deeply offended."  (*Id.* ¶

329.)

Relator took a long-scheduled vacation after the Las Vegas meeting and, upon returning

to her office on Sunday, August 17, 2008, could not access her office computer.  (*Id.* ¶ 330.)  She

was terminated the next day.  (*Id.*)  Relator alleges that, because she "exposed the illegal

kickbacks being spent on the National Accounts and P-Hold facilities, and Omnicare's larger

scheme to dominate the market . . . Omnicare could not tolerate the threat [she] posed, and she

was terminated."  (*Id.* ¶ 331.)

These allegations give rise to her retaliation claim.

### 2.  *Legal Standard*

"The whistleblower provision of the False Claims Act, 31 U.S.C. § 3730(h), encourages

employees with knowledge of fraud to come forward by prohibiting retaliation against

employees who assist in or bring *qui tam* actions against their employers."  *United States ex rel.*

*Patton v. Shaw Servs., LLC*, 418 F. App'x 366, 371 (5th Cir. 2011) (citing *Robertson v. Bell*

*Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994)).  Specifically, § 3730(h)(1) prohibits

employers from retaliating against Relator for undertaking "lawful acts . . . in furtherance of an

action under this section or other efforts to stop 1 or more violations of this subchapter."  To

state a claim for FCA retaliation, Relator must allege that she "engaged in activity protected

under the statute, that h[er] employer knew [s]he engaged in protected activity, and that [s]he was discharged because of it." *Patton*, 418 F. App'x at 371-72 (citing *Robertson*, 32 F.3d at 951). FCA retaliation does not sound in fraud and thus need not be pleaded with particularity; Defendants do not argue otherwise.

> 3. *Analysis*

> a. <u>Whether Relator Has Alleged That She Engaged in Protected Activity</u>

As another district court in this circuit recently explained, "[t]o engage in protected activity under the Act, an employee need not 'have filed an FCA lawsuit or [ ] have developed a winning claim at the time of the alleged retaliation.'" *United States ex rel. George v. Boston Scientific Corp.*, 864 F. Supp. 2d 597, 604-05 (S.D. Tex. 2012) (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 236 (1st Cir. 2004) and citing *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 741 (D.C. Cir. 1998); *Schuhardt v. Washington Univ.*, 390 F.3d 563, 567 (8th Cir. 2004)). Rather, "an employee's actions must be aimed at matters that reasonably could lead to a viable claim under the Act" or "matters demonstrating a 'distinct possibility' of False Claims Act litigation." *Id.* at 605 (collecting cases). Synthesizing cases across the circuits, the *George* court explained that either formulation is "satisfied when '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'" *Id.* (quoting *Hoyte v. Am. Nat. Red Cross*, 518 F.3d 61, 71 (D.C. Cir. 2008)). Both "fraud" and "against the government" are important. It is certainly not enough to merely complain of an employer's inefficiency or incompetence, *Patton*, 418 F. App'x at 372 ("Mere criticism of Shaw's construction methods, without any suggestion that Patton was attempting to expose illegality or fraud within the meaning of the FCA, does not rise to the level of protected

activity."), and it is equally unavailing to assert that a non-governmental third party is the victim of fraudulent conduct, *George*, 864 F. Supp. 2d at 606 ("the focus is on whether the internal complaint 'allege[s] fraud on the government'" (quoting *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 516 (6th Cir. 2000))).

Relator has alleged that she believed Omnicare guilty of "inducement," that she knew "inducement" was illegal, and that she alerted her supervisor, Richow, and pharmacy managers to those beliefs.  (*See*  Doc. No. 97 ¶¶ 313, 316.)  The thrust, then, of Relator's allegations is that she believed Omnicare had violated the AKS.  It is also clear, in view of the TAC as a whole, that she was highly knowledgeable of how Omnicare's business was closely tied to government programs, specifically Medicare and Medicaid.  Thus, it seems quite plausible that Relator's actions were "calculated to, or reasonably could, lead to a viable FCA case."  *United States ex rel. Dyson v. Amerigroup Texas, Inc.*, No. CIV.A. H-03-4223, 2005 WL 2467689, at *2 (S.D. Tex. Oct. 6, 2005) (Ellison, J.).

Defendants argue that "Relator has not alleged a single instance where she complained or reported that Omnicare was submitting or causing fraudulent claims for payment to the government" and that "[s]he also does not allege that she investigated fraudulent claims for payment, or that she attempted to stop any purported FCA violations."  (Doc. No. 120 at 39.)  As an initial matter, relators are not required to try to stop fraud in order to state a claim for retaliation.[16]  Further, Defendants' attempt to cherry-pick what it is that Relator needs to have investigated or reported to her employer — they contend, in essence, that presentment triggers protection; inducement does not — is inappropriate.

---

[16] And moreover, it cannot necessarily be said that Relator did not try to stop fraud.  By seeking to collect from Five Star (Doc. No. 97 ¶ 311), Relator essentially tried to prevent kickbacks from being paid, which would in turn lead to future claims not being false.

Defendants' argument boils down to a contention that, even where the underlying FCA allegation is based upon AKS violations and false certification, Relator nevertheless must have taken action regarding the presentment to the Government of false claims. That assertion does not withstand scrutiny. First, it would be strange if Relator was required to investigate or report something that, even to this day, she need not have pleaded in order to survive a motion to dismiss. *See supra* Section III.A.3. Second, if Defendants' proposed rule is the right one, then one of two things must be true. Either Relator was required to have exposed the kickbacks and false certifications *in addition to* presentment of false claims, or alternately, investigating/reporting AKS violations was irrelevant and the only way she could have triggered the FCA's retaliation protection is to have alerted her employer to the presentment of fraudulent claims. The former cannot be true because to so require would force Relator to "develop a winning *qui tam* suit," *Dyson*, 2005 WL 2467689, at *2, and the cases make clear that she need not have done so. And, the latter is nonsensical, because in that scenario, she either knows about kickbacks and does not say anything, and so is rewarded for being less than forthcoming in what she told her employer, or she has no idea that the inducements have taken place, and thus does not know why the claims were fraudulent at all. In that final scenario, she would be protected for blindly claiming fraud without any real basis for doing so. The rule Defendants would have the Court apply cannot bear the weight they place upon it.

In short, Relator's allegations that she alerted her supervisor and various pharmacy managers to inducement satisfies her obligation to have pleaded that she engaged in protected activity.

b.  Whether Relator Has Alleged That Her Employer Had Knowledge of Her Protected Activity

Not only must Relator have engaged in protected activity, but "[t]he employer must be on notice that the employee is investigating fraud."  *George*, 864 F. Supp. 2d at 607.  "'Notice can be accomplished . . . by any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility.'"  *Id.* at 608 (quoting *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1262 (D.C. Cir. 2004)).  "Courts have found this notice prong satisfied based on allegations that the employee complained directly to her supervisors."  *Id.* (citing *Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 32 (1st Cir. 2012); *United States ex rel. Sarafoglou v. Weill Med. College of Cornell Univ.*, 451 F. Supp. 2d 613, 624-25 (S.D.N.Y. 2006)).  Importantly, though, while "'[i]nternal reporting has been held to constitute protected activity . . . if an employee wants to impute knowledge to the employer for purposes of the second prong of the analysis, he must specifically tell the employer that he is concerned about possible fraud.'"  *Id.* (quoting *United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 105 (D. Conn. 2006)).  Still, "no 'magic words' — such as 'illegal' or 'unlawful' — are necessary to place the employer on notice of protected activity."  *Id.* (quoting *Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 484 (7th Cir. 2004)).

In the instant case, this second requirement is not particularly distinguishable from the first, given that Relator's protected activity was the very act of alerting higher-ups in the corporation that she was aware of potentially illegal kickbacks.  The Court finds it sufficient that Relator has alleged that she alerted Richow and pharmacy managers to potentially fraudulent activity.[17]

---

[17] The Court notes that, per the TAC, on the Sunday evening that Relator returned from her August 2008 vacation and could not access her computer, Richow told her that he did not know

c.   <u>Whether Relator Has Alleged Causation</u>

Relator's final duty is to plead that her termination was motivated by her protected activity.  *George*, 864 F. Supp. 2d at 609 (citing *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 422(D.C. Cir. 2005)).  This is akin to the causal link step of Title VII's *McDonnell Douglas* analysis.  "The showing necessary to demonstrate the causal-link part of the *prima facie* case is not onerous; the plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Dyson*, 2005 WL 2467689, at *3 (internal quotation marks omitted). "[T]emporal proximity alone, when very close, can in some instances establish a *prima facie case* of retaliation."  *Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 808 (5th Cir. 2007).

The Court is satisfied that Relator has met her burden.  She has not pleaded exactly when it was that she alerted Richow that she believed inducement was taking place, but she has averred that she had her conversation with pharmacy managers in May 2008 and sought to collect from Five Star in June 2008.  In the next few months, she was transitioned out of her old job, "interrogated" about her earlier activities, accused of having an extramarital affair, and finally, terminated.  These other occurrences serve as probative indicia that she had fallen out of favor with her employer and, when considered in concert with the close timing between her protected activity and her termination, convince that Court that Relator has sufficiently alleged a causal connection.  Relator's retaliation claim may go forward.

---

why she was having such problems.  (Doc. No. 97 ¶ 330.)  That, in turn, could suggest that he did not know she was going to be terminated the next day and thus had not spoken to any other Omnicare executives about Relator's concerns.  If all of that were true, perhaps Relator's employer could not be said to have had knowledge of her protected activity.  But it is not for today to figure out which of two alternative scenarios played out.  Relator's allegations rise to the level of plausibility necessary for her suit may proceed.

### D.  Conspiracy

As another means of combatting false claims, § 3729(a)(1)(c) — previously § 3729(a)(3) — imposes liability upon one who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid."[18]  The Fifth Circuit has held "that to prove a False Claims Act conspiracy, a relator must show '(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement.'"  *Grubbs*, 565 F.3d at 193 (quoting *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008)).  FCA conspiracy claims must meet Rule 9(b)'s particularity requirement, both with respect to the agreement and the overt acts taken in furtherance thereof.  *Id.* (citing *FC Inv. Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1097 (D.C. Cir. 2008)).

Defendants contend that the TAC "is completely devoid of any facts regarding how Omnicare or its customers entered into an actual agreement for the purpose of defrauding the government."  (Doc. No. 120 at 29.)  But, of course, Relator is not required to plead (or even, at the end of the day, prove) the manner in which the agreement came into being, only that an agreement did in fact exist.  *Cf. United States ex rel. Jamison v. McKesson Corp.*, No. 208CV214 SA DAS, 2009 WL 3176168, at *14 (N.D. Miss. Sept. 29, 2009) (explaining that traditional conspiracy principles apply to False Claims Act conspiracy claims and that under those principles "'[e]xpress agreement among all the conspirators is not necessary to find the existence of a civil conspiracy,'" and instead "'[a]ll that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy'" (quoting *United States v. Murphy*,

---

[18] The new version of the statute subjects to liability an individual who "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."  31 U.S.C. § 3729(a)(1)(C).

937 F.2d 1032, 1039 (6th Cir. 1991))), *modified on other grounds on reconsideration,* 2:08CV214-SA-DAS, 2010 WL 1223876 (N.D. Miss. Mar. 25, 2010).   And the nature of Relator's FCA allegations is such that an agreement between Omnicare and its customers is the only way in which the scheme makes any sense.   That is, the idea that Omnicare "would forego payment for Medicare Part A related services and the recipient SNFs would refer Medicaid/Medicare Part D patients to Omnicare" and then that "the SNFs would represent to Medicare in cost reports that they were paying for the free or greatly discounted drugs"[19] only makes any sense at all if there was some agreement between Omnicare and the SNFs.   Taking Relator's allegations as true, there is no possible explanation for either Omnicare's or the SNF's actions *other than* an agreement between the parties.   This is the quintessential illustration of a case in which the agreement can be "naturally inferred from the allegations."   *Grubbs*, 565 F.3d at 194; *see also Nunnally*, 2012 WL 1866586, at *2 ("An agreement may be inferred when it is a natural consequence of the factual allegations.").

Having decided that Relator has sufficiently (and with particularity) pleaded the existence of an agreement, it is not particularly difficult to arrive at the conclusion that she has also pleaded overt acts.   Setting the forgiveness of debt to one side, as there is at least an argument to be made that it is more omission than act, Omnicare officials actively sought to stop Relator from making collections.   (Doc. No. 97 ¶¶ 301-03, 324.)   The Court is satisfied by Relator's allegations of overt acts and thus will allow the conspiracy claim to proceed.

### E.  Reverse False Claims

Just as the False Claims Act prohibits the use of false records or statements to induce the government to make a certain payment, it likewise prohibits the use of false records or

---

[19] (Doc. No. 137 at 41.)

statements to conceal an obligation to pay money to the government.  The so-called Reverse False Claims Act subjects to liability anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  *See* 31 U.S.C. § 3729(a)(7) (version operative when complaint was filed).[20]   That obligation to the Government must not be "potential" or "contingent" upon any sort of "intervening discretionary governmental acts."  *United States ex rel. Marcy v. Rowan Companies, Inc.*, 520 F.3d 384, 391 (5th Cir. 2008).  Worthy of emphasis is the Act's imposition of liability upon he who "*causes* a false statement to be made" just as it does he who makes the false statement.  *United States v. Caremark, Inc.*, 634 F.3d 808, 815 (5th Cir. 2011); *see also Riley*, 355 F.3d at 378 ("The FCA applies to anyone who knowingly assists in causing the government to pay claims grounded in fraud, without regard to whether that person has direct contractual relations with the government." (internal quotation marks omitted)).

As the Court understands the TAC, Relator's §§ 3729(a)(2) and (a)(7) claims represent two sides of the same coin.  That is, her theory of liability on the (a)(2) claims is that SNFs used Medicare and Medicaid cost reports to get claims paid, and that those claims were false because they were tainted by kickbacks paid by Omnicare (thus also subjecting Omnicare to liability).  Conversely, her theory of liability on the (a)(7) claims is that the SNFs used those same reports to conceal that the SNFs were duty-bound to reimburse the Government for all the claims it paid, because those claims, tainted by Omnicare's kickbacks, were false.  Put differently, insofar as "[i]n a reverse False Claims Act suit, there is no improper payment by the government to a defendant, but rather there is an improper reduction in the defendant's liability to the government," *Marcy*, 520 F.3d at 390, the liability to the Government at issue arises because of

---

[20] Section 3729(a)(7) has since been recodified as § 3729(a)(1)(G).

the § 3729(a)(2) violations.  Viewed yet another way, so far as the Court can tell, the same set of operative facts give rise Relator's claims under both sections.

Mindful that the Reverse False Claims Act's "purpose was not to provide a redundant basis to state a false statement claim under subsection (a)(2)," *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 171-72 (E.D. Pa. 2012) (internal quotation marks omitted), the Court cannot allow the Reverse False Claims Act claims to proceed.  Indeed, other courts that have confronted similar allegations have drawn the same conclusion.  For instance, in *United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505 (E.D. Pa. 2010), Relator "argue[d] that SMS demanded payment based on a fraudulently induced contract each time it requested payment," that, as a result, "each invoice was inflated, imposing an affirmative obligation on SMS to refund payments it improperly received from the government," and that "[b]ecause SMS did not refund the payments, it avoided or decreased its obligation to the government."  *Id.* at 514.  The court realized that relator was "essentially alleging that SMS failed to refund the false claims that the government paid" and that, in doing so, "[h]e [wa]s merely recasting his false statement claim under § 3729(a)(2)."  *Id.*  The court therefore dismissed his § 3729(a)(7) claim.  Likewise, in *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313 (S.D.N.Y. 2004), "the reduction in money owed to the Government" was "the very same money that the defendants will procure from the U.S. Treasury (as a government payment), according to Taylor's claims under either section 3729(a)(1) and (a)(2)."  *Id.* at 338.  Thus, the court held that, "[b]ecause Taylor's allegations state a claim under sections 3729(a)(1) and (2), they cannot also form the basis for a claim under subsection (a)(7)" and it dismissed the latter claim.  *Id.* at 339; *see also United States v. HCA Health Servs. of Oklahoma, Inc.*, No. 3:09-CV-

0992, 2011 WL 4590791, at *8 (N.D. Tex. Sept. 30, 2011) (same).  The Court here does likewise.[21]

### F.  State Claims

Relator has brought claims under the laws of twenty-one states and the District of Columbia.  For the reasons discussed above, Defendants' Rule 12(b)(6) and Rule 9(b) challenges are largely denied, though, as with the federal claims, the Court dismisses the state claims that arose before 2005 or after 2008.  Below, it addresses Defendants' remaining challenges in turn.

#### 1.  Failure to File in State Court

Defendants assert that California, Delaware, the District of Columbia, Florida, Indiana, Louisiana, and Massachusetts require that Relator file her complaint in state court and that Relator has failed to allege that she did so.  *See* Cal. Gov't Code § 12652(c)(2); 6 Del. Code § 1201(c); D.C. Code § 2-381.03(b)(2); Fla. Stat. Ann. § 68.083(3); Indiana Code §§ 5-11-5.5-3(h), 5-11-5.5-4(a)(2); La. Rev. Stat. § 46.439.1(A); Mass. Gen. Laws ch. 12 § 5C(2).   As Defendants acknowledge, however, their primary support for that position, *United States ex rel. Galmines v. Novartis Pharm. Corp.*, No. CIV.A. 06-3213, 2013 WL 2649704, at *13 (E.D. Pa. June 13, 2013), has since been withdrawn and amended.  *See* No. CIV.A. 06-3213, 2013 WL 5924962 (E.D. Pa. Nov. 5, 2013).   Absent any additional arguments in support of dismissing these state claims on this particular basis, the motion is **DENIED**.

---

[21] The Court dismisses all § 3729(a)(7) claims: those premised upon false cost reports and those based on violations of Omnicare's Corporate Integrity Agreement.  Because, at least as a factual matter, the latter claims are distinguishable from those at issue in *Thomas*, *Taylor*, and *HCA Health Services*, Relator should file a motion pursuant to Federal Rule of Civil Procedure 59 if she believes they also differ in a legally relevant manner.  Briefing already on file is not sufficient to answer the question.

2.  *Failure to Provide Information to Specified State Officials or Entities*

Defendants argue that each state statute under which Relator has pressed a claim requires that she provide certain relevant information to specific state government officials or entities on or around the time she filed suit — and that she failed to do so.  *See* Cal. Gov't Code § 12652(c)(3); 6 Del. Code § 1203(b)(2); D.C. Code § 2-381.03(b)(3); Fla. Stat. § 68.083(3); Ga. Code Ann. §49-4-168.2(c)(1); Haw. Rev. Stat. § 661-25(b); 740 Ill. Comp. Stat. 175/4(b)(2); Ind. Code § 5-11-5.5-4(c); La. Rev. Stat. Ann. § 46:439.2(a)(2); Mass. Gen. Laws ch. 12 § 5(C)(3); Mich. Comp. Laws §400.610a(2); Mont. Code § 17-8-406(2); Nev. Rev. Stat § 357.080(5); N.J. Stat. Ann. § 2A:32C-5(d); N.M. Stat. § 27-14-7(C); N.Y. St. Fin. § 190(b); 63 Okl. St. Ann. § 5053.2(b)(2); R.I. Gen. Laws § 9-1.1-4(b)(2); Tenn. Code Ann. § 71-5-183(b)(2); Tex. Hum. Res. Code Ann. § 36.102(a); Va. Code Ann. § 8.01-216.5(b); Wisc. Stat. Ann. §20.931(5)(b). Relator contends that she is not actually required to plead compliance with these statutes, but to the extent that she was, she was permitted to do so generally.  On this last point, Defendants do not argue otherwise.

Defendants cite two cases for the proposition that failure to plead compliance with the various state service mandates warrants dismissal.  The first is not helpful.  In *United States ex rel. Bogart v. King Pharm.*, 414 F. Supp. 2d 540 (E.D. Pa. 2006), where Relator had in fact failed to serve state governments, the Court granted a motion for summary judgment *brought by those states* because "Relator's failure to adequately serve the States . . . frustrated the purposes of the States' statutes and prejudiced the States accordingly."  *Id.* at 545.  The second, *United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 906 F. Supp. 2d 1264, 1278 (N.D. Ga. 2012), offers the holding that Defendants would like this Court to adopt but not reasoning that it can accept.  The *Saldivar* court dismissed a raft of state law claims for failure to plead

compliance with state law requirements just like — some, identical to — those at issue here.  But the cases it relied upon to reach that conclusion are not in accord.  In *LaPosta v. Borough of Roseland*, 309 F. App'x 598 (3d Cir. 2009), the Third Circuit affirmed dismissal because plaintiff had not actually served *the defendant* with a notice of claim as he was required to do.  The case had nothing to do with pleading requirements.  *Id.* at 603.  Likewise, in *Edwards v. City of New York*, No. 10-CV-OI047 ARR LB, 2011 WL 5024721 (E.D.N.Y. Oct. 18, 2011), the court considered whether plaintiff had in fact complied with the requirement that she notify the municipality soon after a claim *against it* arose.[22]  *Id.* at *6.  It declined to adopt defendants' position that failure to plead compliance necessitates dismissal.  *Id.*  Finally, in *Tatum v. City of New York*, No. 06-CV-4290PGGGWG, 2009 WL 1748044 (S.D.N.Y. June 19, 2009), the court acknowledged that, where a state statute required plaintiff to plead that thirty days had elapsed since he had served defendant with a notice of claim, dismissal could be the appropriate response to plaintiff's failure to so plead, at least so long as defendant raised the argument in a timely fashion.  *Id.* at *8.

There are two primary reasons why the Court is unwilling to rely upon these cases.  First, there is a standing issue lurking in the background.  In each case, it was the party that had been most directly aggrieved by the procedural failure that sought dismissal.  That is, in *Bogart*, it was the states that had not been served that sought to dismiss Relator's claims and, in *La Posta*, *Edwards*, and *Tatum*, it was the municipal defendant, which had not been provided the notice to which it was entitled, that moved for dismissal.  These cases do not answer the question whether Omnicare can seek to vindicate an injury that it did not suffer.  Second, *Bogart*, *LaPosta*, and

---

[22] Indeed, the case relied upon by the *Edwards* court held that "[f]ailure to comply with this condition precedent is grounds for dismissing New York state-law claims in federal court" and did not concern itself with failure to plead compliance.  *Cantave v. New York City Police Officers.* No. 09–CV–2226 (CBA)(LB), 2011 WL 1239895, at *12 (E.D.N.Y. Mar. 28, 2011).

*Edwards* construed actual compliance with procedural requirements, not whether compliance had been pleaded, and *Tatum* examined whether a condition precedent had been pleaded because a state statute explicitly required as much.  These cases do not suggest that pleading compliance is required absent a statutory directive to do so.

Thus, with both cases relied upon by Defendants set to the side, the Court declines to impose this pleading requirement upon Relator.  The state statutes that Defendants allege Relator has failed to comply with require that Relator do something — serve or otherwise provide information to various states — contemporaneously with, or subsequently to, the filing of her Complaint.  Thus, in practice, Relator would either need to plead compliance before she actually knows that she has done so, or she would have to plead that she *intends to comply*.  Neither seems to be particularly meaningful.  When this case reaches the summary judgment stage, Defendants may argue that Relator has failed to serve the state plaintiffs, if Defendants actually believe that to be the case, but for now, the Court declines to dismiss the state claims for failure to plead procedural compliance.[23]

### 3. Retroactivity

Next, Defendants assert that certain state false claims acts were enacted after Defendants' alleged wrongdoing began and cannot be applied retroactively.  Because the Court has limited Relator's claims to a 2005-2008 timeframe, the Court need to address retroactivity for the Hawaii (effective 2000), Massachusetts (effective 2000), New Mexico (effective 2004), and Virginia (effective 2003) statutes.  That leaves the Court to consider Georgia (effective May 24, 2007), Indiana (effective May 11, 2005), New Jersey (effective March 13, 2008), New York

---

[23] Of course, should Defendants renew this argument, the Court would take a closer look at whether they are the proper parties to be making it.

(effective April 1, 2007), Oklahoma (effective November 1, 2007), and Rhode Island (effective February 15, 2008).[24]   Each of those statutes is silent on retroactivity.

While the parties debate the applicability of the Supreme Court's decisions in *Bradley v. Sch. Bd. of City of Richmond*, 416 U.S. 696 (1974) and *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), as another court within this district noted when addressing this same issue, "the issue is whether *state* statutes should be given retroactive effect when the state legislatures did not provide any guidance.  Thus, the court must consider how each state or locality at issue treats retroactivity issues."  *United States ex rel. King v. Solvay S.A.*, 823 F. Supp. 2d 472, 525 (S.D. Tex. 2011), *order vacated in part on other grounds on reconsideration*, No. CIV.A. H-06-2662, 2012 WL 1067228 (S.D. Tex. Mar. 28, 2012).

Indeed, asked in *King* to determine whether state false claims acts applied retroactively, Judge Miller undertook an exhaustive analysis of the relevant state laws for each state that is at issue here, ultimately dismissing each with prejudice.  This Court agrees with the *King* court's reasoning and therefore dismisses with prejudice all claims brought under the laws of Georgia, *see id.* at 526, Indiana, *see id.* at 527, New Jersey, *see id.*at 528, New York, *see id.* at 529, Oklahoma, *see id.*at 529-30, and Rhode Island, *see id.* at 530-31, that arose before the relevant state statutes became effective.

### 4. Time-Barred Claims

Defendants assert that certain of Relator's state law claims are time barred (Doc. No. 120 at 45 (pointing to four- and six-year statute of limitations)), but the Court's decision to limit her claims to the 2005-to-2008 period moots those arguments.

---

[24] Relator has conceded that Montana's Act is explicitly prospective (Doc. No. 137 at 50), and so no claims arising before Oct. 1, 2005 can be vindicated under the laws of that state.

### 5.   Additional and Independent Bases

Defendants have moved to dismiss the Georgia state law claims because there is no state law analogue to the federal AKS.  (Doc. No. 120 at 45.)  Regardless of that argument's merit, however, Relator has pleaded that Defendants' violations of the *federal* AKS triggered violations of the *state* false claims act (*see* Doc. No. 97 ¶¶ 504-05), and Defendants have not argued otherwise.  Consequently, the Motion to Dismiss the Georgia claims on this basis is **DENIED**.

Defendants also argue for dismissal of the Texas state claims, at least those arising prior to May 4, 2007, because before that date, "Texas did not permit relators to pursue FCA claims without state intervention."  (Doc. No. 120 at 45.)  The *King* court considered, and rejected, this very argument and this Court is not inclined to disagree.  As that court noted, the legislature amended the rule in question in 2007, allowing a Relator to proceed where the state has declined to intervene.  *King*, 823 F. Supp. 2d at 522.  The amendment "appl[ied] 'only to conduct that occur[ed] on or after the effective date ... of [the] Act.'"  *Id.* (quoting Tex. Human Res. Code Ann. § 36.104 (Vernon Supp. 2010) (Historical and Statutory Notes)).  While defendant there, like Defendants here, would have liked the court to have read "conduct" as referring to the defendant's conduct that allegedly gave rise to liability, "[t]he 'conduct' discussed in section 36.104 is the State of Texas's election not to intervene."  *Id.*  Thus, because the state of Texas had filed its notice of non-intervention in 2009, the relevant conduct took place after the statute's amendment and relator could proceed without Texas' participation.  *Id.*  The same is true here.  This suit was not filed until 2008 and thus Texas did not decline to intervene until sometime after the relevant statute was amended in 2007.  Relator may thus press the claim without the assistance of the state and the Motion to Dismiss the Texas claims is therefore **DENIED**.

## IV.    GEMUNDER'S MOTION TO DISMISS

Defendant Joel Gemunder served as President and, later, CEO of Omnicare from 1981 to July 2010.  (Doc. No. 97 ¶¶ 7, 218.)  When Relator first filed this suit in November 2008, she did not name Gemunder, then still CEO, as a Defendant.  (Doc. No. 1.)  Nor did she add him as a party in December 2008, or September 2009, when she amended her complaint.  (Doc. Nos. 5, 13.)  She also did not seek leave to add Gemunder in July 2008 when she sought to file the TAC. (Doc. No. 68.)  Rather, she asserted that she did not intend to "raise[] new claims" (Doc. No. 88 at 2) and intimated that, at least with respect to amendments that did not rely on certain confidential documents, her primary purpose was to shore up her Complaint for a fight over its compliance with Rule 9(b), (Doc. No. 102 at 13, 20).  In granting the Motion to Amend, the Court stated that Defendants could be dropped but did not have occasion even to consider whether they could be added.  (*Id.* at 27.)  Nevertheless, when the TAC was filed on September 6, 2013, Gemunder was named as a defendant.  (Doc. No. 97.)

In adding Gemunder without first seeking leave to do so, Relator not only ran afoul of the Federal Rules of Civil Procedure, but she also violated the spirit, if not the letter, of the Court's order allowing her to file the TAC.  "Although Rule 15 'evinces a bias in favor of granting leave to amend,' it is not automatic."  *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 203 F. Supp. 2d 704, 718 (S.D. Tex. 2000) (quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981)).  Rule 15(a)(2) required that Relator seek this Court's permission before filing the TAC, and it is clear from the written motion (Doc. No. 88 at 2), and from Relator's comments at this Court's hearing (Doc. No. 102 at 13, 20), that she did not request to add a new Defendant.  Moreover, in granting leave to file the TAC, the Court relied upon Relator's representation that there would be no new claims and, by explicitly stating that Defendants could

be dropped, signaled that it would at the very least want to hear more before it allowed the opposite.  It is beyond cavil that the Court may strike claims that exceed the scope of its order granting leave.  *See, e.g.*, *Maisa Prop., Inc. v. Cathay Bank*, No. 4:12-CV-066-A, 2012 WL 1563938, at *2 (N.D. Tex. May 2, 2012) (striking defendant because it was "apparent to the court that Maisa's amended pleading exceed[ed] the scope of the" court's order and thus violated Rule 15(a)(2)); *Farac v. Sundown Energy, LP*, No. CIV.A. 06-7147, 2009 WL 2241329, at *3 (E.D. La. July 23, 2009) (granting motion to strike and/or dismiss because the court found "that Isla's Fourth Amended Complaint was filed in violation of the Court's May 26th minute entry, and in violation of LR 7.6E and Rule 15 of the Federal Rules of Civil Procedure"); *Benton v. Baker Hughes*, No. CV 12-07735 MMM MRWX, 2013 WL 3353636, at *3 (C.D. Cal. June 30, 2013), *DeLeon v. Wells Fargo Bank, N.A.*, 10-CV-01390-LHK, 2010 WL 4285006, at *3 (N.D. Cal. Oct. 22, 2010).  As such, Defendant Gemunder's Motion to Dismiss is **GRANTED**.

## V.    CONCLUSION

"[T]he FCA has grown, in fits and starts, into the government's chief weapon against fraud in connection with federal programs and expenditures" and "in practice most FCA enforcement efforts are initiated as private lawsuits brought pursuant to the FCA's *qui tam* provisions."  David Freeman Engstrom, *Harnessing the Private Attorney General: Evidence from Qui Tam Litigation*, 112 Colum. L. Rev. 1244, 1270 (2012).  *Qui tam* relators, then, play a central, if not vital, role, in the Government's enforcement apparatus.  Still, because of the potential for relators to reap a phenomenal windfall and the attendant risk of abuse by professional relators, and in recognition of the fact that FCA cases can be particularly burdensome (and the successful ones particularly injurious) for defendants, more is required of

the *qui tam* relator than almost any other litigant in federal court.[25]  *See generally* Ni Qian, Note, *Necessary Evils: How to Stop Worrying and Love Qui Tam*, 2013 Colum. Bus. L. Rev. 594 (2013).  A relator must generally be the first to file a suit making her particular allegations, must not base her action upon publicly disclosed information (or must be the original source of that information), and must plead with particularity in compliance with Rule 9(b).  *See* 31 U.S.C. § 3730(e)(3); *id.* § 3730(e)(4): Fed. R. Civ. P 9(b).  An added wrinkle here is that Relator was (rightly) required to make her allegations using only her first-hand knowledge and ignoring documents obtained by the Government, and shared with her, during its investigation.  (*See generally* Doc. No. 102.)

All of that is to say that Relator's Third Amended Complaint was required to meet an exceptionally high bar and has been subjected to intensive scrutiny — and for good reason.  But upon careful consideration of that complaint, the meticulous briefing by the parties, and the voluminous, if not always coherent, case law on the subject, the Court determines that most of the Relator's claims pass muster.  To review, Omnicare's Motion to Dismiss (Doc. No. 120) is **DENIED** as to Counts I and II in the TAC except with respect to claims that arose before 2005 and after 2008, for which it is **GRANTED**.  The Motion is **DENIED** as to Counts III and IV. The Motion is **GRANTED** as to Count V.  As for Counts VI-XXVII, those claims are likewise limited to the 2005-2008 timeframe and claims brought under the laws of the following states are **DISMISSED** to the extent they arose before the law's effective date: Georgia (effective May 24, 2007), Indiana (effective May 11, 2005), Montana (effective Oct. 1, 2005), New Jersey (effective March 13, 2008), New York (effective April 1, 2007), Oklahoma (effective November 1, 2007), and Rhode Island (effective February 15, 2008).  Defendant Gemunder's Motion to Dismiss

---

[25] Petitioners for a Writ of Habeas Corpus may be one obvious exception.

(Doc. No. 126) is **GRANTED**.    Relator's Motion to Strike the TAC (Doc. No. 132) is

**GRANTED**.

      **IT IS SO ORDERED.**

      **SIGNED** at Houston, Texas on this twelfth day of June, 2014.

**KEITH P. ELLISON**
**UNITED STATES DISTRICT COURT JUDGE**