**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| *ex rel. Susan Ruscher, et al.* | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Civ. Action No. 4:08-cv-3396** |
| **VS.** | § | |
| | § | |
| **OMNICARE, INC.** *et al* | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM & ORDER**

More than seven years after it was filed, this long-running *qui tam* case is approaching its trial date. Relator has alleged that Defendant Omnicare, Inc., and its subsidiaries (collectively, "Omnicare") engaged in a complex scheme to offer illegal remuneration to skilled nursing facilities (SNFs) in exchange for referrals to Omnicare's pharmacy business. After more than seven months of fact discovery and three more months of expert discovery, the parties have filed dispositive motions addressing every issue remaining in the case. This Order resolves the dispositive motions as well as the pending motions to strike and motions to exclude expert testimony.

For the reasons set out in this Order, Omnicare's Motion to Strike Relator's Supplemental Expert Reports (Doc. No. 365) is **GRANTED** in part and **DENIED** in part. Relator's *Daubert* Motion (Doc. No. 378) is **DENIED**. Omnicare's *Daubert* motions (Doc. Nos. 379, 381, 383) are **GRANTED** in part and **DENIED** in part. Omnicare's Motion for Summary Judgment (Doc. No. 385) is **GRANTED** and Relator's Motion for Partial Summary Judgment (Doc. No. 371) is **DENIED**. Relator's Motion to Strike Defendants' Summary Judgment Evidence is **DENIED**.

I.      **BACKGROUND**

    **A.  Factual Background**

        *1.  Omnicare and the Long Term Care Industry*

Defendant Omnicare is the nation's largest long-term care pharmacy (LTCP). LTCPs provide skilled nursing facilities (SNFs) and other long-term care institutions with prescription and non-prescription medications. Defs.' Ex. 2, Expert Report of Gregory K. Bell, Ph.D. (hereinafter "Bell Rep.") ¶ 11. In addition, Omnicare and other LTCPs provide their customers with services related to medication delivery, including the review of drug orders, coordination of documentation related to prescriptions, in-service training for nursing home staff, and drug regimen reviews. *Id.*

Often, Omnicare and a SNF chain will sign a preferred provider agreement that designates Omnicare as the pharmacy of choice for facilities in that chain. *See, e.g.*, Defs.' Ex. 55 at 563. These preferred provider agreements set forth the contract pricing for pharmacy products and services, establish payment terms and billing processes, and provide mechanisms for resolving billing disputes. *Id.* at 665. Omnicare will then enter into separate agreements with each individual facility in the chain. *Id.* With some frequency, the Omnicare-SNF preferred provider agreements included a provision for a "prompt-pay discount" if the SNF paid its invoices to Omnicare within an agreed-upon time after the date of the invoice. *See, e.g.*, Rel.'s Ex. 12 at 47-48.

Many of the SNF residents for whom Omnicare provides pharmaceuticals and pharmacy services are enrolled in Medicare Part A, Medicare Part D, and/or Medicaid. Through those programs, the government is responsible for reimbursing the SNFs and/or Omnicare for services provided to covered patients. The structures of these programs have some important differences.

Medicare Part A covers care for patients in a SNF for up to 100 days of a patient's stay. Bell Rep. ¶ 14. SNFs receive a predetermined daily rate for each day of care provided to a Part A patient, and the SNFs pay the LTCPs' bills directly from that per diem revenue. Defs.' Ex. 4, Expert Report of John MacDonald III (hereinafter "MacDonald Rep.") ¶ 16. SNFs receiving Part A payments file annual cost reports reflecting the expenses of their operations, including the costs of pharmacy products and services obtained from LTCPs for Part A patients. *See* Expert Report of David Bellamy (hereinafter "Bellamy Rep."), Doc. No. 379-1.

After a SNF resident has exhausted his 100-day Part A coverage, his pharmacy expenses may be covered by Medicare Part D, Medicaid, private insurance, or self-pay. Medicare Part D is administered by private plan sponsors. For SNF residents covered by Part D, the LTCP bills the private plan sponsor directly for pharmaceutical products and services provided to the patient. MacDonald Rep. ¶ 22. Likewise, for SNF residents covered by Medicaid, the LTCP bills the state Medicaid program directly. *Id.* The SNFs are not involved in the pharmacy billing for Part D and Medicaid patients.

### 2. Omnicare's Relationships with the SNFs

The instant lawsuit concerns the relationships between Omnicare and eight SNF chains — Avamere, FSC, Five Star, Fundamental, Harborside, Life Care, Millennium, and Shoreline — during the period 2005 through 2008. For all or some of that period, Omnicare had preferred provider agreements with the eight chains. During that period, Omnicare had significant past-due Accounts Receivable (A/R) owing from some or all of the eight chains. The total past-due A/R related to all SNFs grew to approximately $300 million by the end of 2008. Rel.'s Mot. at 5.

The parties dispute the reason for the growth in Omnicare's accounts receivable. Relator contends that Omnicare had an intentional scheme to avoid collecting on SNF Part A debt in

order to maintain its preferred provider relationships with the SNFs and to continue servicing the SNFs' Part D and Medicaid patients. Omnicare, on the other hand, contends that the mounting A/R was largely a result of errors in its billing processes, audits, and disputes with SNFs about pricing, and the SNFs' delays in paying their bills. The Court discusses the evidence supporting these contentions in its discussion of the parties' motions for summary judgment, below.

### 3. Relator's Employment at Omnicare

Relator Susan Ruscher worked in Omnicare's collections department from July 2005 until she was terminated in August 2008. While at Omnicare, she worked on collecting Omnicare's past-due A/R from the company's SNF clients. At the time of her termination, she took a variety of documents from Omnicare and provided them to her lawyers in connection with this lawsuit. Relator obtained other documents from her Omnicare co-workers, Cathy Brumleve and Kevin Stallo, that were used in the preparation of this suit. Omnicare has alleged various tort claims against Relator related to the taking of these documents.

### B. Procedural Background

Relator filed her original complaint in this action in November 2008 and filed her First Amended Complaint a month later. (Doc. Nos. 1, 5.) Relator filed a Second Amended Complaint in September 2009. (Doc. No. 13.) After a two-year investigation, the Government notified the Court in December 2012 that it would not intervene at that time.  (Doc. No. 45.)  The Court permitted Relator to file a Third Amended Complaint in August 2013, but ruled that she could not rely on documents subpoenaed from Omnicare by the Government. (*See* Minute Entry, Aug. 29, 2013.) Omnicare and its former CEO, Joel Gemunder, moved to dismiss the Third Amended Complaint in November 2013. (Doc. Nos. 120, 126.) In June 2014, the motions were granted as to Mr. Gemunder and granted in part and denied in part as to Omnicare. (Doc. No. 147.) The

parties engaged in discovery throughout the remainder of 2014 and into 2015. Omnicare filed an Amended Answer alleging counterclaims against Relator in December 2014. (Doc. No. 214.) Relator filed a Fourth Amended Complaint in May 2015. (Doc. No. 360.) The instant motions were filed on or before the motions deadline of June 12, 2015, and trial is set for October 5, 2015.

## II. OMNICARE'S MOTION TO STRIKE SUPPLEMENTAL EXPERT REPORTS (Doc. No. 365)

### A. PROCEDURAL HISTORY

This motion concerns the timing of Relator's supplemental expert disclosures, which requires some understanding of past disputes over scheduling in this years-long case. Discovery has been contentious throughout, and the deadlines for both expert and fact discovery were extended earlier this year. The final discovery deadlines were as follows:

| | |
|---|---|
| **Fact discovery** | March 5, 2015 |
| **Relator's expert witnesses** | March 13, 2015 |
| **Defendants' expert witnesses** | April 23, 2015 |
| **Expert discovery complete** | May 12, 2015 |

*See* Minute Entry (Feb. 5, 2015). Separately, the parties agreed that Defendants would provide an expert report on their counterclaims on or before April 23, 2015, and Relator would have until May 22, 2015 to serve an expert report on the counterclaims. *See* E-mail correspondence between Ashley Hardin and Chelsea Dal Corso, Defs.' Ex. 1. Any related depositions would be scheduled on or before June 5, 2015. *Id.*

On May 22, 2015, Relator served on Defendants two additional expert reports from previously-disclosed experts, David Grabowski and E. Venson Wallin. (Doc. Nos. 388-3, 388-4.) Mr. Wallin's report is styled as a "Response Report," while Dr. Grabowski's report is titled a

5

"Rebuttal Report." The parties agree that these additional reports do not address Omnicare's counterclaims, but instead respond to the opinions offered by Defendants' experts.

Omnicare has now moved to strike the May 22 reports on the grounds that they were impermissible "sur-rebuttal" reports not contemplated by the scheduling order or the parties' agreement on expert discovery regarding the counterclaims. (Doc. No. 365.)

### B. DISCUSSION

Omnicare argues that the rebuttal reports should be stricken because they were filed after the close of expert discovery on May 12, 2015. By the explicit terms of the scheduling order, taken alone, the May 22 reports were untimely and are subject to being stricken. In her response, Relator offers two routes through which the Court could find that the additional reports were timely.

### i. Under Rule 26(a)(2)(D)(ii)

Relator suggests that, because the Court's scheduling order did not specifically name a date for her to provide rebuttal evidence related to Defendants' experts, the Federal Rules of Civil Procedure fill the gap. Rule 26 allows a party to make expert disclosures "intended solely to contradict or rebut evidence on the same subject matter identified by [another party's experts], within 30 days after the other party's disclosure." FED. R. CIV. P. 26(a)(2)(D)(ii). Accordingly, in Relator's view, she had until May 22 to serve her rebuttal expert reports.

Rule 26(a)(2)(D) expressly applies only "[a]bsent a stipulation or a court order." Here, the Court's scheduling order provided a date for Relator to file her expert reports, March 13, 2015, and a date by which expert discovery had to be complete, May 12, 2015. That date was presumably chosen to give the parties one month, in which the factual record would be complete,

to prepare their motions for summary judgment. However, the scheduling order did not expressly address the issue of rebuttal expert reports. This admittedly creates some ambiguity.

The Court must decide whether that silence indicates that the parties did not contemplate the use of rebuttal expert reports or that the parties intended to default to the gap-filler provisions of Rule 26. The district courts have not reached a consensus on this issue. *Compare Walker v. Yellow Freight Sys., Inc.*, No. CIV.A. 98-3565, 1999 WL 757022 (E.D. La. Sept. 24, 1999) (default provisions of Rule 26 apply where scheduling order does not set deadline for rebuttal experts), *with Paramount Media Grp., Inc. v. Vill. of Bellwood*, No. 13 C 3994, 2015 WL 3622768 (N.D. Ill. June 10, 2015) (granting motion to strike where parties' agreed scheduling order provided no deadline for rebuttal experts).

In deciding this motion, the Court is mindful of the parties' prior disputes regarding scheduling. At a February 5, 2015, hearing, the Court and the parties engaged in an extensive discussion of the remaining dates in the case, including the expert deadlines. At that time, Relator sought an extension of the expert discovery deadline to June 12, 2015, while the dispositive motions deadline would have remained the same. Omnicare opposed this motion because, among other reasons, it did not want to move the expert discovery deadline in order to ensure that it would not be "jammed up" with additional expert discovery coming in while Omnicare prepared for the June 12, 2015 dispositive motions deadline. Transcript of Feb. 5, 2015 Hr'g, Doc. No. 277 at 22:20. At no time did Relator suggest that, even if the expert discovery deadline were not moved, Omnicare would still be receiving new "rebuttal reports" from her experts while preparing for the dispositive motions. Unlike in *Syringe Development Partners L.L.C. v. New Medical Technology, Inc.*, there is no evidence that the parties expressly contemplated rebuttal evidence, and there is some evidence that Omnicare did not expect rebuttal

evidence to be filed. No. IP98-1726-C-M/S, 2001 WL 403232, at *36 n.7 (S.D. Ind. Feb. 9, 2001).

Under the circumstances, the Court concludes that the scheduling order does not permit the filing of rebuttal expert reports after the close of expert discovery. The explicit deadline for the completion of expert discovery, the short time allotted between the end of discovery and the filing of dispositive motions, and the discussion of scheduling at the February 5, 2015, hearing all indicate that neither the parties nor the Court contemplated the use of rebuttal expert reports at the time the scheduling order was entered.

### ii.  Under Rule 26(e)

Alternatively, Relator argues that the May 22 reports should be considered "supplemental" reports under Rule 26(e). That rule provides that "[a] party who has made a disclosure under Rule 26(a) … must supplement or correct its disclosure … in a timely manner if the party learns that in some material respect the disclosure … is incomplete or incorrect." FED. R. CIV. P. 26(e)(1). The duty of supplementation includes both the expert's report and his or her deposition. FED. R. CIV. P. 26(e)(2).

Here, Relator's additional expert reports do not contend that their previous opinions were "incomplete or incorrect." Instead, the reports respond to the criticisms levied by Omnicare's experts on Relator's original expert evidence, and reassert the *correctness* of Relator's experts' original opinions. *See, e.g.*, Response Report of E. Venson Wallin, Jr., CPA, CGMA (May 22, 2015), Doc. No. 388-4 at 4 ("My opinions expressed in my report dated March 13, 2015 in this matter have not changed."); Grabowski Rebuttal Report (May 22, 2015), Doc. No. 388-3 at 6-8 (criticizing the analysis of Omnicare expert Paxton Wiffler and reasserting the conclusion that "the data support my conclusion regarding Omnicare's lack of intention to collect in a timely

manner"). This type of bolstering is not a permissible use of a supplemental report under Rule 26(e). *See Hein v. Deere & Co.*, No. C11-0113, 2013 WL 3816699, at *7 (N.D. Iowa July 22, 2013).

Relator cites a Tenth Circuit case, *Miller v. Pfizer, Inc.*, for the proposition that "supplements to expert reports are appropriate when they are in response to assertions that there are gaps in the expert's chain of reasoning." Relator's Br. at 9. To the contrary, the Tenth Circuit did not lay down a mandatory rule, but instead said that such supplements "may" be appropriate in *some* circumstances. 356 F.3d 1326, 1332 (10th Cir. 2004). To determine whether supplementation was appropriate, the Court reviewed the whole of the record with regard to the relevant expert and considered whether he had other opportunities to respond to criticisms of his analysis. In *Miller*, the Court concluded that the district court had not abused its discretion by excluding the supplemental reports because the expert had other opportunities to respond to concerns raised by other experts and the court. *Id.* at 1334. Likewise, here, Relator's experts would have opportunities to testify, and Relator would have an opportunity to cross-examine the Defendants' experts as to their opinions. The Court is not concerned that striking these additional reports will deprive Relator of an opportunity to respond to Defendants' experts criticisms.

There is, however, one exception: in Section II(C)(4) of his report, Dr. Grabowski does revise his analysis in light of new information. In the section of the report titled "Omnicare's Incomplete Data Regarding Rejected Claims," Dr. Grabowski uses information gleaned from Omnicare expert John MacDonald's report to revise his analysis. *See* Grabowski Rebuttal Report at 13-14. That analysis led to revisions to the thirteen tables attached to Dr. Grabowski's original report. *Id.* at 13. The Court concludes that this section of the Rebuttal report is a "supplemental" report under Rule 26(e), and declines to strike that section of the Rebuttal Report.

9

### III.   *DAUBERT* MOTIONS

### A.  LEGAL STANDARD

A witness qualified as an expert may give an opinion or other expert testimony if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "[C]ourts are charged with a 'gatekeeping role,' the objective of which is to ensure that expert testimony admitted into evidence is both reliable and relevant." *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008).

The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible. *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The court "must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). In making its reliability determination, the court should not decide the validity of the expert's conclusions, but should instead consider the soundness of the general principles or reasoning on which the expert relies and the propriety of the methodology that applies those principles to the facts of the case. *Daubert*, 509 U.S. at 594–95; *Paz*, 555 F.3d at 388. In *Daubert,* the Supreme Court provided several nonexclusive factors to

guide courts in evaluating the reliability of a methodology. Those factors include whether the theory can be and has been tested; whether the theory has been subjected to peer review and publication; the theory's known or potential rate of error; the existence and maintenance of standards and controls; and whether the theory is generally accepted. 509 U.S. at 593–94.

### B.  RELATOR'S *DAUBERT* MOTION (Doc. No. 378)

Relator Susan Ruscher has filed a Partial Motion to Exclude Certain Testimony and Opinions Stated by Omnicare's Expert Witnesses. (Doc. No. 378.) Some of Relator's objections apply to all of Defendants' experts; others are specific to individual experts. The Court will first take up Relator's generalized objections, and then will turn to the criticisms lodged at the individual experts.

#### i.    Opinions regarding harm to the government

Relator asks the Court to exclude the opinions of Omnicare experts Gregory Bell and John MacDonald that the Government suffered "no harm" from Omnicare's fraudulent conduct. Relator argues that this opinion is a misstatement of the law on damages and also is an inappropriate legal opinion.

Both Mr. Bell and Mr. MacDonald opine that the Government could not have suffered damages from Omnicare's alleged kickback scheme because the same drugs would have been prescribed and paid for regardless of the pharmacy providing the drugs. Report of Gregory Bell (hereinafter "Bell Rep."), Doc. No. 378-1 at 15-16; Report of John MacDonald III (hereinafter "MacDonald Rep."), Doc. No. 378-2 at 61-62.[1] According to Relator, this misstates the law because courts in Anti-Kickback Statute (AKS) cases have held that the measure of damages is

---

[1] Relator's opening brief occasionally refers to a third Omnicare expert, Robert Palumbo, in connection with this argument. As she only cites specific pages of Mr. Bell's and Mr. MacDonald's reports, the Court assumes that she is moving to exclude only their opinions regarding harm to the Government.

the total amount of government payments tainted by illegal conduct. *See United States v. Rogan*, 517 F.3d 449, 453-54 (7th Cir. 2008); *United States ex rel. Freedman v. Suarez-Hoyos*, No. 8:04-cv-933-T-24 EAJ, 2012 WL 4344199, at *4-5 (M.D. Fla. Sept. 21, 2012). If Relator is correct as to the measure of damages, testimony regarding actual economic harm to the government would arguably be irrelevant and excludable on that basis. For the reasons set forth later in this Order, the Court does not resolve the question of law on damages, and also declines to exclude the experts' testimony on this basis.

### ii.     Cumulative and/or redundant testimony

Next, Relator asks the Court to exclude cumulative testimony by Mr. Palumbo, Mr. MacDonald, and a third expert, Paxton Wiffler. According to Relator, the expert reports contain largely duplicative explanations of the long-term care industry and Omnicare's dealings with the eight SNFs at issue. They also contain similar refutations of the reports of Relator's own experts, Dr. Grabowski and Mr. Wallin. Whether testimony is cumulative will depend on what testimony is actually offered to the jury. The Court will not strike sections of the expert reports, but will enforce Rule 403 at the time of trial.

### iii.     Testimony on the long-term care industry

Relator's final general objection is to sections of three of the expert reports in which the experts provide general background information regarding the long term care industry. Report of Paxton Wiffler (hereinafter "Wiffler Rep."), Doc. No. 378-3 at § III; MacDonald Rep. at § III; Palumbo Rep. at § V. Relator argues that this testimony will not be helpful to the jury because the background information is not specific to Omnicare. The Court disagrees. In general, an expert witness can "educate the factfinder about general principles" relevant to the case. FED. R. EVID. 702 advisory committee's note. Such testimony is particularly helpful where, as here, the

case concerns a complex industry governed by a number of federal statutory and regulatory schemes. Of course, the Court will not allow Omnicare's witnesses to testify *ad infinitum* about background facts. But some testimony of that nature will be helpful to the jury, and the Court will not strike the Omnicare witnesses' background material at this time.

### iv.   Robert Palumbo

#### 1.  Expert qualifications

Relator argues that Omnicare expert Robert Palumbo lacks the experience necessary to support his conclusions. Mr. Palumbo is the former Vice President of Billings and Collections for PharMerica, a significant competitor to Omnicare in the long-term care pharmacy business. He is currently a consultant to healthcare organizations, including long-term care pharmacies and skilled nursing facilities. In his deposition, Mr. Palumbo identified major differences between the ways that PharMerica and Omnicare organized their billing and collections practices. Deposition of Robert Palumbo, Doc. No. 378-7 at 199:18-200:24. Relator contends that the differences Mr. Palumbo has identified between the two companies makes him unqualified to testify about collections at Omnicare.

The Court disagrees that the differences in the corporate structure of PharMerica disqualify Mr. Palumbo as an expert in this case. Mr. Palumbo's practical experience in collecting payments from SNFs on behalf of a long-term care pharmacy is the basis for his expertise. *See Floyd v. Hefner*, 556 F. Supp. 2d 617, 639 (S.D. Tex. 2008). The majority of Mr. Palumbo's opinions concern the relationship between SNFs and long-term care pharmacies, and do not turn on the organization of Omnicare's collections department. Furthermore, Mr. Palumbo's deposition testimony establishes that, to the extent that Omnicare was organized differently from PharMerica, Mr. Palumbo is familiar with the Omnicare structure. Palumbo

Dep. at 199:18-200:24. Relator is free to ask Mr. Palumbo about these differences on the stand, but they do not disqualify him as an expert.

The cases cited by Relator do not hold otherwise. *Seatrax, Inc. v. Sonbeck Intern., Inc.* upheld the exclusion of a purported expert who, while experienced in the industry, had no training in accounting to support his opinion that the company lost profits due to the defendant's infringing activity. 200 F.3d 358, 371-72 (5th Cir. 2000). In other words, the expert lacked the technical skills to do the analysis that he purported to offer to the jury. That is not the case here. And in *Smith v. Goodyear Tire & Rubber Co.*, the Fifth Circuit held that a polymer expert who had no experience with tires in any professional capacity could not testify that a tire was defective or that a specific design likely caused the tire to fail. 495 F.3d 224, 227 (5th Cir. 2007). Here, Mr. Palumbo has experience in the very industry at issue in the case.

Relator also objects that Mr. Palumbo lacks an accounting background or any other certifications or credentials qualifying him to testify as an expert. As the Court reads Mr. Palumbo's report, he does not offer an opinion on Omnicare's financial statements. Mr. Palumbo is qualified as an expert in this case.

### 2. Opinion on trade secrets

Relator also moves to exclude Mr. Palumbo's opinion regarding Omnicare's trade secrets. In connection with Omnicare's trade secrets counterclaim, Mr. Palumbo's expert report contains the opinion that documents taken by Relator from Omnicare contain "confidential and sensitive information" that could, if given to competitors, cause harm to Omnicare. Palumbo Rep. at ¶ 163-165. Relator contends that this is speculative because, in his deposition, Mr. Palumbo was not able to testify that Omnicare has been actually harmed by any disclosures at this point. Palumbo Dep. at 43:21-44:14. In response, Omnicare argues that Mr. Palumbo's

14

expert opinions go only to prospective future harm, not actual past harm, and that these opinions were based on Mr. Palumbo's experience in the industry. The Court agrees with Omnicare and will permit Mr. Palumbo to testify as to whether the documents were confidential and whether their disclosure to competitors could cause future harm.

### v.    Paxton Wiffler

Relator moves to exclude the expert evidence provided by Paxton Wiffler because 1) he relied on non-peer reviewed reports created by "biased industry sources," and 2) the documents that he reviewed were selected by Carlos Brain, a consultant chosen by Omnicare's counsel. Both of these objections go to the weight of the evidence, not its admissibility. *See 325 Goodrich Ave., LLC v. Sw. Water Co.*, 891 F. Supp. 2d 1364, 1382 (M.D. Ga. 2012) (reliance on biased sources "only go[es] to the weight of the opinions and not their admissibility"); *Imperial Trading Co. v. Travelers Property Cas. Co. of Am.*, No. 06-4262, 2009 WL 2408412, at *2 (E.D. La. July 28, 2009). The Court will not exclude Mr. Wiffler's testimony on this basis.[2]

### C.  DEFENDANTS' *DAUBERT* MOTIONS

Omnicare has moved to exclude three of Relator's experts: David Bellamy, Dr. David Grabowski, and E. Venson Wallin. (Doc. Nos. 379, 381, 383.) The Court takes up each of these motions in turn.

### i.    David Bellamy (Doc. No. 379)

David Bellamy is a certified public accountant with expertise in hospital accounting and financial reporting as well as Medicare cost reporting. His report explains the payment systems

---

[2] In her reply brief, Relator raises a new objection to Mr. Wiffler's testimony: that he has worked for skilled nursing facilities that have had business dealings with Omnicare. Rel.'s Reply Br., Doc. No. 424 at 8-9. Relator cites no authority to support her argument that this business relationship disqualifies Mr. Wiffler from testifying as an expert. As Omnicare did not have an opportunity to respond, and because this is a potential source of bias that can be explored on cross-examination, the Court will not exclude Mr. Wiffler's testimony for this reason.

and accounting obligations of Medicare providers, including the requirement that skilled nursing facilities complete a certification as part of their cost reports and enrollment agreements. Expert Report of David Bellamy (hereinafter "Bellamy Rep."), Doc. No. 379-1. Those certifications include the statement that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute . . . )." *Id.* at 5.

Omnicare argues that Mr. Bellamy's testimony regarding the validity of Medicare claims made by Omnicare and the SNFs is an impermissible legal opinion, not a fact opinion. Specifically, the company objects to Mr. Bellamy's opinion that if a financial arrangement between Omnicare and a SNF is deemed a kickback, then the claims submitted by the provider related to the kickback schemes may be invalid because of the certification of compliance contained in the SNF's cost report. Bellamy Rep. at 5. Omnicare argues that this is a legal opinion that should be excluded. *See, e.g.*, *Estate of Sowell v. United States*, 198 F.3d 169, 171-72 (5th Cir. 1999) (in general, legal opinions are inadmissible). However, courts have permitted experts to testify about the workings of the Medicare systems, because the complexity of the regulations takes them beyond the ordinary understanding of jurors. *See United States v. Abdallah*, 629 F. Supp. 2d 699, 750 (S.D. Tex. 2009) (expert testimony regarding the Medicare payment system can help the jury understand the rules and regulations under which claims were submitted). Mr. Bellamy's testimony about certifications that are required to be contained in SNF cost reports and enrollment agreements will be permitted.[3] Testimony that Omnicare itself

---

[3] The Court is aware that whether a certification by a SNF is sufficient to support liability for Omnicare under the False Claims Act is highly contested by the parties in the Motion for Summary Judgment. For the purposes of the *Daubert* Motion, the Court assumes that it is sufficient.

made such certifications with respect to Medicare Part B is irrelevant and likely to confuse the jurors, and will not be permitted.

Mr. Bellamy will not be permitted to opine about 1) what a SNF should do in the event that debt is forgiven by a vendor, and 2) the intent of the SNFs with respect to their cost reports. *See* Bellamy Rep. § VII, "SNF Cost Reports." The scant record evidence of SNFs' cost reporting practices is not sufficient to make them relevant to any question in front of the jury, and the implication that the SNFs lied on their cost reports is likely to confuse the jury.

### ii.    Dr. David Grabowski (Doc. No. 381)

Dr. David Grabowski, a professor of health care policy at Harvard Medical School, was retained by Relator to calculate damages to the government caused by Omnicare's alleged fraud. Omnicare has moved to exclude the report for several reasons.

First, Omnicare argues that the "opinions" are purely arithmetical calculations, which are not the proper subject of expert testimony. According to Dr. Grabowski's report, he calculated Medicaid and Medicare Part D revenue by sorting through and cleaning up Omnicare's claims data and adding together the amount of Part D claims related to the eight SNF chains at issue. Report of Dr. David Grabowski on Ruscher Damages Calculations (hereinafter "Grabowski Rep."), Doc. No. 381-1 at 5-7. Dr. Grabowski then calculated FCA penalties by determining the total number of qualifying claims and multiplying that number by $5,500 to $11,000, the statutory penalties. *Id.* at 7. Finally, he calculated Medicare Part A damages by adding together Omnicare's past-due accounts receivable for the eight SNFs as of late 2008. *Id.* at 7, 9.

Omnicare argues that this analysis is not helpful to the jury because the jury will be competent to perform these arithmetic calculations for themselves. *See Advanced Drainage Sys., Inc. v. Quality Culverty, Inc.*, No. 2:12-1121, 2015 WL 1299368, at *7-8 (S.D. Ohio Mar. 23,

2015). This argument underestimates the nature of Dr. Grabowski's analysis. The jury cannot reasonably be expected to analyze a database of claims information to come up with damages figures. Because Dr. Grabowski's testimony on the amount of damages will assist the jury, the Court will not exclude it here.[4]

Next, Omnicare argues that Dr. Grabowski lacks the expertise necessary to analyze Omnicare's financial records because he is not an accountant or an economist, and because he has not worked in the industry. In addition, Omnicare points out that Dr. Grabowski had the assistance of a litigation consultant, Mike Augusteijn, in analyzing the data. The Court is not persuaded that Dr. Grabowski lacks relevant expertise. He has a degree in public policy, with an emphasis on economics. Grabowksi Rep. at 3. Dr. Grabowski testified that he supervised Mr. Augusteijn with respect to some steps in the analysis. Grabowski Dep., Doc. No. 382-2 at 28:21-29:8. Omnicare will be free to cross-examine Dr. Grabowski on the issue of Mr. Augusteijn's involvement in the project.

Finally, Omnicare moves to exclude the opinions in Section III of Dr. Grabowski's report regarding the economics of the long-term care industry. First, Omnicare argues that the section of the report is irrelevant to his damages analysis. Second, it argues that Dr. Grabowski has no basis for statements in his report that Omnicare intentionally did not collect from certain SNFs as an inducement, and that he cannot opine as to the intent of the company. Finally, Omnicare argues that other opinions related to market share, pricing power, and missing information in SNF cost reports were irrelevant.

Relator responds that Section III provides needed "context and background" for the damages calculations. To some extent, the Court agrees: the first paragraph of Section III

---

[4] Again, the issue of whether Dr. Grabowski's analysis supports the legally correct measure of damages will be reserved for summary judgment.

describes the relationship between Medicare Part A and Part D, which is essential to understanding the two different categories of damages identified in the Grabowski report.

However, the section also contains a variety of opinions unrelated to damages that are not supported by the limited number of documents that Dr. Grabowski reviewed. *See* Grabowski Rep. at 3 n.1; Deposition of Dr. David Grabowski, Doc. No. 381-2 at 129:3-130:19 (stating that he reviewed only the three e-mails identified in a footnote to his report to support conclusions regarding Omnicare collections practices). In his deposition, Dr. Grabowski backed away from a suggestion that his statements regarding Omnicare's collections practices were opinions as opposed to a summary of the dispute in this case. *Id.* at 125:18-126:13; 148:15-24. His opinions regarding Omnicare's collections practices with respect to chain and non-chain SNFs were based exclusively on a review of Omnicare aging reports; he admitted at his deposition that he had never reviewed data from aging reports before. *Id.* at 201:11-22. Dr. Grabowski's opinions regarding collections practices are unreliable for two reasons: first, he did not have sufficient basis for his opinions, *Paz*, 555 F.3d at 388, and second, he lacked the expertise to form reliable opinions about the accounting documents that he reviewed, *Neal v. City of Hempstead, Tex.*, No. 4:12-cv-1733, 2014 WL 3907785, at *1 (S.D. Tex. Aug. 11, 2014).

In addition, Dr. Grabowski will not be permitted to testify about Omnicare's intent, motive, or state of mind, as that is typically held to be within the province of the jury. *See, e.g.*, *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 442 (E.D.N.Y. 2011); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 545 (S.D.N.Y. 2004). The Court also agrees that Dr. Grabowski's discussion of market share and pricing power is irrelevant to the issues that the jury will decide. Grabowski Rep. at 4. And Dr. Grabowski's statement that some data were missing

from the cost reports that he reviewed is, absent more, irrelevant to Relator's claim that kickbacks tainted the SNFs' Medicare claims.

### iii. E. Venson Wallin (Doc. No. 383)

E. Venson Wallin, a health care consultant and certified public accountant, offered an expert report containing his analysis of Omnicare's billing and collections documents, and concluding that Omnicare implemented irregular billing practices and had questionable business relationships with the eight SNFs at issue. Report of E. Venson Wallin (hereinafter "Wallin Rep."), Doc. No. 383-1.

Omnicare first argues that Mr. Wallin's opinions on its collections practices and business relationships are not reliable because 1) he lacks experience specifically relevant to the issues in this case, and 2) his opinions were based on incomplete facts. The Court disagrees. Mr. Wallin's almost thirty years of experience as an accountant working in the healthcare industry is sufficient to clear the *Daubert* threshold; his comparative lack of experience with the specific types of entities at issue in this case is the proper subject for cross-examination. *See Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) ("Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."). Likewise, the issue of whether he reviewed a sufficient number of documents to support his testimony goes to the weight of that testimony, not its admissibility.

Omnicare next contends that Mr. Wallin's testimony on the aging reports will not assist the jury because it does not "fit" the issues to be decided in the case. *See Daubert*, 509 U.S. at 591. According to Omnicare, Mr. Wallin's testimony about the company's accounts and business relationships does not fit the facts at issue because it is not probative of whether Omnicare had the necessary intent to violate the AKS. *See* 42 U.S.C. § 1320a-7b. However, an expert's

testimony need not be dispositive of all issues in a case to be relevant to the jury. While Relator must offer some evidence tending to show intent, evidence of uncollected debts is evidence that something of value was given to the SNFs, which is an essential element of an AKS violation.

Finally, Omnicare asks the Court to exclude Mr. Wallin's calculations of penalties allegedly due under the Corporate Integrity Agreement. According to Omnicare, this required only an arithmetic calculation that does not require any expertise and should be excluded. The Court agrees. Unlike the calculations performed by Dr. Grabowski, calculating the penalties due under the CIA required only one multiplication: the number of days following the alleged event multiplied by the Stipulated Penalty, $1,000. That is the type of math that jurors can be expected to do for themselves. *See United States v. Grizaffi*, 471 F.2d 69, 74 (7th Cir. 1972) (basic arithmetic is "clearly within the realm of jurors' comprehension").

## IV.    MOTIONS FOR SUMMARY JUDGMENT

Both sides have filed motions for summary judgment (Doc. Nos. 371, 385), and there is considerable overlap between the issues raised by the two motions. Accordingly, the Court will proceed on an issue-by-issue basis, noting whether both parties have cross-moved for summary judgment or whether only one side has filed such a motion. The Court has also taken notice of the Government's Statement of Interest, which addresses certain legal issues pertinent to these motions. Two of the three issues addressed in the Government's filing were undisputed by the parties: it has never been in serious dispute that Relator needs to prove only that an unlawful intent to offer or pay kickbacks was "one purpose" of the remuneration given by Omnicare to the SNFs, or that debt forgiveness can constitute "remuneration" under the statute.[5] The Court will

---

[5] Omnicare has reserved the latter issue, *see* Doc. No. 409 at 5 n.1, but does not dispute it for the purpose of the summary judgment motions.

take up the Government's third point, regarding certification, at the same time that it addresses the parties' arguments on that issue.

### A.  LEGAL STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by showing that there is an absence of evidence to support the nonmoving party's case. *See Celotex*, 477 U.S. at 325. When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the allegations in its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (internal quotation omitted). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### B.  ANTI-KICKBACK STATUTE

Underlying Relator's False Claims Act claims is her allegation that Omnicare violated the AKS by forgiving debt owed by SNFs in order to cause the SNFs to continue to use Omnicare as their preferred pharmacy provider. Both parties have moved for summary judgment on the issue of whether Omnicare violated the AKS in its relationship with the eight SNFs. The AKS prohibits

> knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person … to refer an individual to a person for the furnishing … of any item or service for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(2). The forgiveness of debt owed for services previously rendered can constitute "remuneration" for the purposes of the AKS. *United States ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, No. 2:08-CV-00114, 2012 WL 628515, at *3 (S.D. Ohio Feb. 27, 2012).

The parties do not dispute that at various times in its relationship with the eight SNFs, Omnicare wrote down the balances owed by the SNFs to Omnicare. Nor do the parties dispute that write-downs or non-collection of debt could be the basis for FCA liability, if the necessary intent were proven. The question for the Court to decide, then, is whether the record evidence is sufficient to raise a question of material fact as to Omnicare's intent in making the write-downs. Both sides have moved for summary judgment on this issue.

In order for an offer or payment of remuneration to violate the AKS, the offeror or payor must intend to induce a referral. The referral need not be the sole reason for the payment. *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998); *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011). The presence of a legitimate business purpose for the arrangement or a fair market value payment will not legitimize a payment if there is *also* an illegal purpose. OIG

Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4858, 4864 (Jan. 31, 2005).

However, the requirement that the offer or payment be "knowing[] and willful[]" is significant. An action is taken knowingly if it is done "voluntarily and intentionally, not because of mistake or accident." *Davis*, 132 F.3d at 1094 (citing *United States v. Garcia*, 762 F.2d 1222, 1224 (5th Cir. 1985)). An action is taken willfully if it "was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law." *Id.* "Though scienter is often a fact-bound inquiry, summary judgment is appropriate where plaintiff produces no evidence sufficient to support a finding of the requisite scienter." *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 57-58 (D.D.C. 2007) (internal quotations omitted) (citing 1 JOHN T. BOESE, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 2.04(c)(1) (2d ed. 2000)).

The parties disagree sharply as to whether or not the evidence in the record is sufficient to raise a question of material fact as to Omnicare's intent in writing down SNF debt. Omnicare contends that the evidence indisputably shows that the write-downs were the resolution of legitimate billing disputes with the SNFs. On the other hand, Relator argues that the write-downs were, at least in part, intended to induce the SNFs to continue to contract with Omnicare to provide pharmacy services to the SNFs' Medicare Part A and Part D patients.[6]

---

[6] The Court observes that many of the cases cited by Relator in support of her position involve motions to dismiss under Rule 12(b)(6), not motions for summary judgment under Rule 56. *See, e.g.*, *United States ex rel. Fontanive v. Caris Life Sciences*, No. 3:10-CV-2237-P (N.D. Tex. Oct. 23, 2013); *United States ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, No. 2:08-CV-00114, 2012 WL 628515 (S.D. Ohio Feb. 27, 2012). The issue of whether debt forgiveness can be "remuneration" under the AKS is not in dispute, and these cases do not help the Court determine what evidence is required to show a question of material fact as to a defendant's *intent* with respect to that debt forgiveness.

The Court will review the evidence associated with each of the eight SNFs in turn:[7]

*1. Avamere*

Avamere is a SNF operating in the northwestern United States. Leo Watterson, Memo re: Avamere A/R Settlement (Jan. 16, 2004), Defs.' Ex. 69 at 1. Avamere and Omnicare signed a preferred provider agreement in 2000. *Id.* at 2. Beginning in mid-2001, the parties began to have a dispute over billings, and in 2003 Avamere withheld four months of payments "as leverage" to push Omnicare to resolve the disputes. *Id.* at 3. There was some confusion between Omnicare's local and corporate representatives with respect to how much credit Avamere was entitled to for Omnicare's errors. Defs.' Ex. 215 ("The reality of the situation is that Avamere will not accept anything less than what has already been agreed to on a local level, so were [sic] in for some rough weather if we want to take this in another direction at this point in time."). In January 2005, Relator's aging reports showed $1.4 million owing to Omnicare from Avamere. Rel.'s Ex. 87. Richard Richow calculated that Omnicare had extended $1,117,712 in credit to Avamere, and that the additional $327,000 in A/R was found in an audit to be unverifiable. *Id.* At that time, Avamere was threatening not to renew its contract with Omnicare unless the billing disputes were resolved, and Omnicare's James Jankowski wrote in an email that "it behooves us to get this resolved ASAP." *Id.* In resolution of the dispute, Omnicare wrote off approximately $65,000 of Avamere's debt in late 2005. Defs.' Ex. 70 at 12.

In 2007 and 2008, Avamere once again began skipping payments. Defs.' Ex. 71, 72. The regional collections manager reported that "it is like pulling teeth to get money out of

---

[7] Except where otherwise noted, the exhibit numbers cited in this section refer to the documents attached to Defendants' Motion for Summary Judgment (Doc. No. 385), Relator's Response to that Motion (Doc. No. 399), and Defendants' Reply (Doc. No. 429). Many of these documents were also attached to the filings on Relator's motion for summary judgment, with different exhibit numbers, but the Court will attempt to use just one set of exhibit numbers where possible.

[Avamere]." Ex. 72 at 2. By February 2008, Avamere owed Omnicare $5.7 million, including $500,000 that was more than a year overdue. Rel.'s Ex. 94. In January 2009, the parties reached an agreement in principle to enter into a five-year promissory note to settle Avamere's outstanding balance. Defs.' Ex. 73. Before the agreement was finalized, however, Avamere complained to Omnicare about "constant, ubiquitous and pervasive errors" in Omnicare's billing and pricing practices. Defs.' Ex. 74 at 11. According to Avamere, the company hired a full-time auditor to audit Omnicare's invoices and identify errors. *Id.* Finally, in March 2009, the parties reached a settlement agreement that reconciled the companies' accounts payable/accounts receivable and required Avamere to execute a promissory note for $4.6 million of undisputed past-due debt. Defs.' Ex. 75. The agreement was silent as to the disposition of $600,000 of disputed past due debt, which Avamere claimed was the result of billing and pricing errors by Omnicare. *Id.*; *see also* Rel.'s Ex. 99 (Avamere believed that it should not pay any of the disputed billings due to Omnicare's alleged billing "fraud"). Eventually, the parties settled the remaining disputed debt for an additional payment by Avamere of $180,000. Rel.'s Ex. 101 at 99.

Avamere's corporate representative testified that this number of billing disputes was unusual in the industry, but that, during the course of the dispute, Omnicare collectors "regularly" sought to collect on the debt. Avamere Dep., Defs.' Ex. 9 at 60:1-13; 69:15-21. The company also testified that there was no agreement with Omnicare to forgive Part A debt in exchange for other business. *Id.* at 98:7-11.

For her primary evidence of bad intent, Relator points to the January 2005 Jankowski e-mail. This is the message in which Mr. Jankowski wrote that "it behooves [Omnicare] to get [the billing dispute with Avamere] resolved ASAP" because "Avamere has indicated that they will

not consider renewal with Omnicare unless this billing reconciliation is complete and they will not pay us either." Rel.'s Ex. 87. In addition, Mr. Jankowski wrote that the company's collections strategy needed to be "sensitive to the fact that we want to renew their contract in the fall." *Id.* Nothing in this e-mail suggests that Omnicare intended to forgive debt in order to get renewals. Mr. Jankowski was obviously — understandably — interested in a quick resolution to the dispute in order to preserve the parties' business relationship; this does not amount to evidence of an intent to induce referrals.

In addition, Relator points to emails in which Omnicare collections representatives — including Ms. Ruscher — were asked not to collect on Avamere accounts. Rel.'s Ex. 90-92. In December 2006, when Ms. Ruscher inquired about unpaid bills, the pharmacy's general manager indicated that checks were forthcoming and that "[Avamere's] excuse was they purchased 3 facilities and were strapped for cash (at our expense, what's new!)." Rel.'s Ex. 90. In March 2007, Sheree Card, who worked for the Omnicare subsidiary who serviced the Avamere facility, asked Omnicare corporate collections to stop collecting on the account because payment arrangements had been made and putting the account into collections impeded the pharmacy's ability to continue to bill the facility. Rel.'s Ex. 92. This does not show intent to improperly forgive debt in exchange for referrals; it just suggests a difference in strategy between the local and national collections officials.

A close examination of the record shows a long history of disputes over billing and nonpayment by Avamere. In the case of the disputes resolved in 2009, when a settlement was reached, Avamere paid about 1/3 of the disputed amount. The record shows that this was a compromise: Avamere had previously insisted that it was not required to pay *any* of that amount. Relator has introduced no evidence tending to prove that the purpose of the settlement was to

induce further referrals, rather than the settlement of a legitimate dispute. The single email from Mr. Jankowski referring to impending contract renewal does not create a material fact as to Omnicare's unlawful intent.

    2.  *Family Senior Care*

Family Senior Care (FSC) became an Omnicare customer as part of the break-up of the Mariner chain of skilled nursing facilities. Defs.' Ex. 76-77. FSC took over 57 of Mariner's facilities in January 2006. The record shows that at the time of the transition Omnicare had conflicting information about who was responsible for the facilities' pre-2006 unpaid A/R. *Compare* Defs.' Ex. 76 ("no old balances will be addressed by the new owner"), *with* Rel.'s Ex. 62 ("ALL OPEN INVOICES WILL BE PAID BY FSC REGARDLESS OF DATE"). Throughout 2006, internal Omnicare emails show efforts to collect from FSC. Defs.' Ex. 77-82. In July 2006, Kathy Morgan told Marylou Carelli, the Key Account Manager (KAM) for FSC, that the company was going to require FSC to pay on a cash-on-delivery basis, resulting in a promise of forthcoming payments from FSC. Defs.' Ex. 82. No payments were made, however, as FSC refused to make payments until the companies clarified their contractual agreements and discussed an FSC audit showing billing problems. Defs.' Ex. 84. In October 2006, Omnicare retained legal counsel to pursue the unpaid balances from FSC. *Id.* In connection with the possible litigation, Mr. Richow ordered others in the company to turn on finance charges for FSC, at a rate of 1.5% per month on all balances over 60 days from invoice. Defs.' Ex. 81. By the end of 2006, however, FSC no longer operated any of the facilities it had acquired from Mariner. Defs.' Ex. 85. The new institution that was managing the Mariner/FSC facilities — Fundamental — did not assume FSC's 2006 debt. *Id.* at 4. In July 2007, Omnicare sued Mariner and FSC for the unpaid A/R. Defs.' Ex. 86.

After FSC was no longer servicing the facilities, the A/R grew to $18.7 million in November 2009. Rel.'s Ex. 22 at 12. However, litigation was pending for much of that period, until the case settled in 2011. *See* Defs.' Ex. 24, 86.

Relator contends that Omnicare continued to service FSC facilities after the November 2006 transition to Fundamental. This is based on two March e-mails from Kimberly McElroy, the National Facility Credit & Collections Manager, in which she describes FSC as having "38 facilities in 8 states" and substantial past-due A/R Rel.'s Ex. 65. However, a later e-mail in the thread indicates that the reason for the past-due A/R was that Omnicare could not collect on the A/R while it was the subject of ongoing litigation. Defs.' Ex. 236. In addition, other Omnicare e-mails from the same time period indicate that the facilities had been misclassified as FSC when they were actually serviced by another entity. Defs.' Ex. 234.

On this record, there is simply no evidence 1) that any write-offs were ever given to FSC and 2) that anyone at Omnicare ever had an intent not to collect on FSC's debt in order to induce them to continue to refer Medicare Part D patients to Omnicare.

3.  *Five Star*

Relator identifies several issues related to Five Star that she argues are suggestive of improper remuneration. The first issue she raises concerns prompt-pay discounts. Prior to 2008, Five Star's contract with Omnicare did not include a prompt-pay discount. In September 2006, Pat Keefe proposed a new pricing structure to Five Star, which included a 2% prompt-pay discount for 30-day payment terms. Rel.'s Ex. 52. The stated rationale for the offer was that the existing pricing was "difficult to track and monitor, from both of [the companies'] perspectives." *Id.* The Omnicare-Five Star contract was up for renewal in 2008, but this offer would have been effective October 2006. *Id.* The same prompt-pay discount was offered in a contract

renegotiation meeting in April 2007. Rel.'s Ex. 53. It does not appear in the record that the new terms were accepted until the parties signed a new contract effective December 2008, which included a prompt-pay discount of 2% for invoices paid within 60 days of its effective date. There is no evidence that this discount was ever applied to invoices that were not promptly paid, so the Court cannot conclude that this would be evidence of a kickback.

Next, Relator points to collections efforts regarding Five Star's past-due A/R as evidence of a kickback. In March 2008, Pat Keefe and Richard Richow corresponded regarding Five Star's past due balances. Mr. Richow forwarded Relator's concerns about difficulties collecting from Five Star. Mr. Keefe replied, in part, "We can't allow them to sit on payments. Make the letter [to Five Star] nice but firm in getting this resolved." Rel.'s Ex. 48. In May 2008, Relator again raised the issue of collecting past due A/R from Sunrise homes that had been taken over by Five Star. Five Star Dep., Rel.'s Ex. 55-56. The parties disputed this A/R because Omnicare had apparently applied Sunrise's pricing to these facilities rather than Five Star's pricing, resulting in overbilling. Defs.' Ex. 11 at 34:13-35:6. At that time, Ms. Ruscher was told that the company was hoping to resolve "the extremely old balances that are in dispute" as a part of larger negotiations to settle the matter, including possible acquisition of their pharmacies, contract renewal, and "the addition of significant new business." Rel.'s Ex. 57.

Later in 2008, Ms. Ruscher was removed from collecting on the Five Star account. Relator suggests that this is because the company did not actually want to collect on the debts; to the contrary, her own exhibits indicate that it was a personality issue, and that people in the company believed that they would "get much further" with another collector. *See* Rel.'s Ex. 49.

Omnicare did in fact take up the issue of past A/R in settlement negotiations in January 2009. Rel.'s Ex. 58. Mr. Keefe wrote at that time that "I believe Fran [Murphy, Five Star

executive,] is being reasonable and we need a win in our negotiations on this Settlement Agreement if we are going to be able to successfully negotiate the pharmacy agreements." Rel.'s Ex. 59. A settlement was reached, resulting in a net write-off of $522,152.51. Rel.'s Ex. 59. According to the attached e-mails, the reason for the write-offs is that Omnicare was "unable to obtain backup documentation" for the written-off invoices.[8] *Id.* In addition, some of the written-off A/R may have been accumulated by Sunrise, but Sunrise also refused to pay. Defs.' Ex. 92-93. An additional $98,000 was written-down by Omnicare in 2010 in connection with this settlement. Rel.'s Ex. 61.

Finally, Relator contends that Omnicare's 2012 purchase of Five Star's pharmacy business is somehow related to the alleged kickback scheme. This possibility was first raised in May 2006, when Omnicare first entered into negotiations to purchase Five Star's pharmacy business. Rel.'s Ex. 50, 51. A formal offer to acquire the pharmacy was made in November 2007. Rel.'s Ex. 54. The 2007 negotiations apparently did not go anywhere. However, in 2012, Omnicare did purchase Five Star's pharmacies for $30.7 million. Relator does not connect the pharmacy purchase to her claim that Omnicare and Five Star were trading cash for future referrals.

From this record, it is clear that Omnicare and Five Star were negotiating over old debt in the shadow of a variety of other business relationships, including their ongoing pharmacy agreements and the possibility of purchasing Five Star's pharmacy business. However, Relator must offer evidence that Omnicare "knowingly and willfully" offered or paid an inducement for

---

[8] In her response to Omnicare's motion, Relator points to an e-mail that she wrote in June 2008 in which she objected to writing off A/R for which there was no backup documentation. At that time, she argued that "if they claimed it on there [sic] cost reports, then they should pay it." Defs.' Ex. 96. The record does not show whether the SNF included the charges on its cost reports, and Relator's speculation does not prove anything about *Omnicare's* intent in writing off the charges that they could not verify.

the purpose of generating referrals. That is a high burden, and the Five Star evidence does not meet it.

### 4. *Fundamental*

Relator's evidence of inducement given or offered to Fundamental consists of 1) a prompt-pay discount given to or taken by Fundamental and 2) write-offs of Fundamental A/R in 2007 and 2008.

The Fundamental-Omnicare contract signed in March 2006 provided for a 5.5% prompt-pay discount if Fundamental paid invoices within 60 days. Rel.'s Ex. 12 at 47-48. In August 2006, Pat Keefe approved the prompt-pay discount even though there was a past due balance on the account. Rel.'s Ex. 28. Relator believes this to be because Fundamental was about to take over FSC's Texas facilities — which Omnicare was already servicing — and Omnicare wanted to keep the accounts. Rel.'s Ex. 29. However, no evidence in the record connects these two decisions. Furthermore, Omnicare's contract with Fundamental required new Fundamental facilities to be transitioned automatically to Omnicare. *See* Rel.'s Ex. 28 at 8 ("New THB Facilities or Expansion of Omnicare Geographic Service Area"). There is simply no evidence that the prompt-pay discount was an inducement related to the Texas facilities.

After the Texas facilities were taken on board, Fundamental faced cash difficulties that caused it to get further behind on bills to Omnicare, racking up a total of $6 million in past-due A/R. Rel.'s Ex. 34. Fundamental offered a payment plan pursuant to which it would pay $100,000 over their run rate per week in order to bring the account current. *Id.* Omnicare allowed Fundamental to continue to claim the prompt-pay discount as long as Fundamental followed that plan. Rel.'s Ex. 35-36. Fundamental continued to make the extra payments through at least October 2007. Defs.' Ex. 112. According to Omnicare, allowing Fundamental to continue to take

the prompt-pay discount while it paid off overdue A/R was a way to incentivize Fundamental to continue to make the payments. Rel.'s Ex. 35 (Fundamental only entitled to prompt-pay discount as long as it continues to make extra payments).

During the same period, Fundamental and Omnicare had disputes over pricing and billing. The parties conducted third-party audits of the billing and pricing disputes and began settlement negotiations. Defs.' Ex. 104-106; 111; *see also* Rel.'s Ex. 37. Relator makes much of an internal Omnicare e-mail in which Omnicare's Bert Brady noted that Omnicare owed Fundamental a credit of $1,000,000 based on the audit results, and suggested that, when Omnicare paid that amount, Fundamental would return it to Omnicare as a way to reduce its outstanding A/R. Rel.'s Ex. 37. Since Mr. Brady made the suggestion that this would *hasten* Fundamental's efforts to bring its payments current, the Court does not believe any intended inducement can be inferred from this e-mail. And contrary to Relator's suggestion, there is no evidence to tie these settlement negotiations to any potential for added business in Texas — either before or after 2007.

Finally, Relator points to a September 2008 settlement agreement in which Omnicare agreed to pay Fundamental $2 million in resolution of Fundamental's claim that Omnicare had overcharged the company $2.6 million and Omnicare's claim that Fundamental had taken improper prompt-pay discounts. Rel.'s Ex. 45. Relator contends that this payment was improper because of Fundamental's outstanding A/R at that time. She bases this claim on e-mails exchanged between Mr. Brady and Mr. Richow which calculate the amount of past-due A/R to be $2.5 million ($9.4 million in total A/R, reduced by current invoices and Pharmasource). Rel.'s Ex. 45. That e-mail also refers to a forthcoming $2 million credit to Fundamental's accounts — possibly the settlement amount. The only evidence that Relator can muster to suggest that this is

anything other than a genuine settlement of a real dispute is a series of joking e-mails exchanged between Fundamental's Matt Baccala and Mr. Brady. Rel.'s Ex. 44. Given the jocular nature of the exchange, the Court cannot interpret Mr. Baccala's statement that "You better have a $2 million check in front of you!" and Mr. Brady's reply "Does it need to be signed????" to be an offer and exchange of a *quid pro quo*. *Id.*

5. *Harborside*

Relator's evidence of unlawful conduct regarding Harborside centers on four different periods in its relationship with Omnicare. First, in 2004, Harborside challenged Omnicare's past billing with an audit. An email from Omnicare Key Account Manager Jeffrey Woodside shows that the parties were negotiating the audit around the same time that the parties were also engaged in renewal agreements. Rel.'s Ex. 13. In the end, the dispute was resolved with a Memorandum of Understanding between the parties that provided for Omnicare to credit Harborside $37,500 per month for 24 months. Rel.'s Ex. 14 at ¶ 2. In the event that the contract was terminated early, Harborside would forego the remaining credits. *Id.* Relator argues that this provision is improper because it is contingent on Harborside remaining an Omnicare customer. *See also* Rel.'s Ex. 13 (e-mail from Jeffrey Woodside recognizing that the settlement was "contingent on a renewal agreement"). In the October 2004 pharmacy provider agreement between Omnicare and Harborside, the parties also agreed to a 3% web-based billing discount and a 1% prompt-pay discount. Rel.'s Ex. 15. These discounts were provided on a going-forward basis.[9]

---

[9] Relator repeatedly argues that Omnicare should not have put prompt-pay discounts into contracts with customers whose previous payments had been late. However, this seems to misapprehend the nature of such discounts — as the Court understands them, a customer would be entitled to take the discounts only for future, *timely* payments. This seems to the Court to be a completely reasonable effort to reduce Omnicare's future collections costs by encouraging

34

Next, Relator points to an email from June 2005 regarding Omnicare's efforts to collect on Harborside's past-due A/R. In an e-mail, Gina Timmons wrote to Pat Keefe and Richard Richow that "it is my understanding that we are not going to send that letter to Harborside at this point. We do not want to introduce an irritant that might impede progress on picking up their newly acquired KY facilities. Richard, please sit on this for a month or so and we will see where we are." Rel.'s Ex. 16. Simply delaying on one step in the collections process is not evidence of a kickback. Nor do those e-mails appear to relate to the ongoing audit of Omnicare's third-quarter 2004 invoices. *See* Rel.'s Ex. 17, 18 (showing Omnicare conceding to some of Harborside's audit adjustments and disputing others). Omnicare did not begin servicing the Kentucky facilities referenced in the Timmons e-mail until after Sunbridge purchased Harborside in 2007. *See* Defs.' Ex. 246 at 82-83 (showing Omnicare served no Harborside facilities in Kentucky as of Feb. 2007); Rel.'s Ex. 25 at 35 (Omnicare began servicing *Sunbridge's* Kentucky facilities in July 2007).

Third, Relator points to issues surrounding the prompt-pay discounts in 2005 and 2006. In July 2005, Harborside's Andy Almeida e-mailed with Omnicare's Gina Timmons regarding increasing their discount from 4% to 5%. Rel.'s Ex. 19. This was the result of an increase in the electronic billing discount to account for an increase in Omnicare's dispensing fee. Rel.'s Ex. 23. The prompt-pay component of the discount remained 1%. *Id.* Harborside did pay invoices based on the prompt-pay discount even when late-paying invoices, but Relator's own evidence indicates that Omnicare had the right to challenge those discounts. Rel.'s Ex. 21 (describing Omnicare's cash accounting procedures and acknowledging that, where Harborside took an

---

previously-delinquent customers to make timely payments. *See* OIG Advisory Opinion No. 08-03 (Rel.'s Ex.  33) (prompt-pay discounts are legitimate if the discount is a "pragmatic financial decision" and not intended to induce referrals).

unwarranted credit, "Richard Richow would take that conversation up with Harborside"). Richow questioned the unwarranted prompt-pay discounts at least once, in July 2006. Rel.'s Ex. 20. The record is not clear as to whether Omnicare ever pursued the unwarranted discount issue with Harborside.

Finally, Relator argues that a 2010 write-off of Harborside A/R was improper remuneration. Harborside had been acquired by Sunbridge in April 2007. The October 2010 write-off consisted of pre-April 2007 billings that Harborside refused to pay. Defs.' Ex. 128, 259. This write-off is outside of the relevant period for this lawsuit, and Relator does not connect it to any additional referrals by Harborside or Sunbridge.

### 6. Life Care

Relator's evidence of illegal behavior related to Life Care is that Omnicare reached agreements with the company in 2009 in which Omnicare agreed to 1) pay Life Care $667,000 as a settlement of billing disputes, 2) give Life Care a prompt-pay discount going forward, and 3) add six new Life Care facilities to the new contract. Rel.'s Ex. 69, 70.[10] Relator believes that the $667,000 payment was really intended to induce Life Care to add the additional six facilities. However, the only evidence in the record about the purpose of the payment is the actual settlement agreement, which states that the payment was the resolution of disputes regarding pricing and billing. Rel.'s Ex. 70 at 2. In addition, the record indicates that Life Care was contractually required to allow Omnicare to service new Life Care facilities under the companies' Preferred Provider Agreement. Defs.' Ex. 190 at 10.

### 7. Millennium

---

[10] The parties make a number of arguments about the total amount of past-due A/R that Life Care accumulated at various times during the relevant period. As it is only *forgiveness* of A/R that would constitute an AKS violation, the Court need not resolve the parties' disputes about the total amount of A/R accrued at various times.

Relator's first evidence of improper remuneration regarding Millennium is from February 2007, at which time Millennium had a delinquent balance of $4,191,589.19. Rel.'s Ex. 73. In a letter to the company, Omnicare Regional VP Dave West offered a $300,000 discount in exchange for payment of the delinquent balance, taking the amount owed to $3,891,589.19. *Id.* Relator contends that this was an effort to retain patient referrals from Millennium's facilities. She has no documents to support this assertion. Omnicare's evidence shows that the parties were engaged in a significant billing dispute in this period, with Millennium asking for $566,344.37 in credits based on alleged billing errors. Defs.' Ex. 262, 271. The February 2007 proposal — a $300,000 discount plus $125,000 in credits — appears to represent a compromise. On this record, Relator has not raised a question of material fact as to the intent behind the discount offer.

Next, Relator points to evidence that Millennium was continuing to take a prompt-pay discount on late-paid invoices in July 2009. However, her own evidence shows that Omnicare did not believe that this was appropriate. *See* Rel.'s Ex. 75 ("Millennium is short paying [current] invoices by 12%"); *see also* Defs.' Ex. 273 ("the pharmacy has never agreed to the prompt pay discount"). Similarly, evidence that Omnicare agreed to give Millennium a prompt-pay discount on a going-forward basis in 2009 is not evidence of a kickback. Given Millennium's problems making payments, a prompt-pay discount was a reasonable way to incentivize it to make payments and reduce Omnicare's collections costs.

Finally, Relator points to settlements with Millennium facilities in 2009 and 2010 as evidence of kickbacks. *See* Rel.'s Ex. 79-83. The settlements followed vigorous, multi-year disputes between the parties. Defs.' Ex. 268-270; 272-74; Rel.'s Ex. 85-86. One of the offers made during the negotiations was to waive finance charges that were part of the bills. Rel.'s Ex.

86. It is not clear how that factored into the final settlement. Without more, the Court cannot conclude that Relator has raised a question of material fact as to the purpose of these settlements.

   *8. Shoreline*

The final SNF at issue in the case is Shoreline/Seacrest. Relator's first evidence of inducement concerns approximately $3 million in past-due A/R that was due in November 2005. According to Omnicare records, Omnicare asked Shoreline to pay $1 million of that after taking into account 1) a $1.2 million settlement over a pricing dispute and 2) $800,000 of overcharges identified in an audit. Rel.'s Ex. 104; Defs.' Ex. 101, 155, 167.

Those negotiations continued into 2007. Relator argues that Omnicare's settlement efforts were influenced by its desire to win new business from Seacrest, a related company. *See* Rel.'s Ex. 105 ("I CANNOT ASSURE OMNICARE THAT WE WILL WIN THE SEACREST BUSINESS IF WE REACH AGREEMENT ON THE SHORELINE NEGOTIATIONS BUT I CAN ASSURE THAT WE WILL NOT WIN SEACREST IF WE FAIL TO REACH COMPROMISE ON SHORELINE."). Eventually, a settlement was reached in August 2007. Rel.'s Ex. 102. According to that agreement, Shoreline would pay approximately $10 million of the $13.8 million in original Omnicare invoices. *Id.* at 827.

Relator next alleges improper remuneration with regard to a Shoreline facility called Grant Park. In May 2008, Omnicare had $130,000 of A/R on its books from Grant Park. Rel.'s Ex. 106. Omnicare employee Jeff Woodside directed Omnicare's collections department not to place Grant Park on cash-on-delivery and not to terminate its service because Omnicare was aiming to get additional business from Shoreline. *Id.* Mr. Woodside directed the collector to "continue with … collection efforts but without the threat of COD or termination." *Id.* Collections efforts did continue. *See* Defs.' Ex. 186 (discussing payment plan for Grant Park).

Without anything in the record showing whether the debt was ever paid, the change in collections strategy does not prove that Omnicare was seeking to offer remuneration for referrals. In addition, the $130,000 in A/R was related to durable medical equipment provided under Medicare Part B, so it is of questionable relevance to Relator's allegations regarding Part A and Part D. *See* Defs.' Ex. 63. Eventually, a settlement was reached on the Grant Park debt that included a $250,000 credit related to billing errors. Rel.'s Ex. 113; Defs.' Ex. 34, 250.

Relator also argues that Shoreline failed to pay $13.4 million in past-due A/R accrued between January 2008 and June 2009. Rel.'s Ex. 102 at 24-35; Ex. 103 at 24-26. However, this ignores a settlement agreement between Omnicare and Shoreline in which Shoreline promised to pay $13.2 million of that debt. Defs.' Ex. 32 at 490-92.

Of all of Relator's evidence, the e-mails relating to Shoreline come closest to creating a question of material fact as to Omnicare's intent in reaching a settlement that forgave past A/R in exchange for future business. The e-mails unambiguously reveal that Omnicare employees were negotiating over A/R in the shadow of contract negotiations. However, the requirement that remuneration be paid "knowingly and willfully" requires some evidence of a "bad purpose." *Davis*, 132 F.3d at 1094 (citing *Garcia*, 762 F.2d at 1224). The Court does not believe the Woodside e-mails can be read to suggest a bad purpose, as opposed to an honest, if business-minded, desire to maintain good customer relationships.

9. *E. Venson Wallin Expert Report*

In the absence of direct evidence that Omnicare intended to induce referrals by partially forgiving the SNFs' A/R, Relator relies on the report of an expert witness, E. Venson Wallin, to establish that Omnicare's business practices are unusual in the industry. While Mr. Wallin cannot testify as to Omnicare's intent, *see, e.g.*, *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d

531, 545 (S.D.N.Y. 2004), his testimony could be circumstantial evidence of wrongdoing. However, Mr. Wallin's testimony adds little to the documentary evidence already reviewed by the Court. Mr. Wallin's opinion is that some of the transactions described in those documents are "irregular" or "unusual" in the healthcare industry, pursuant to his experience. The fact that some of Omnicare's business practices were unusual is, absent more, not enough to raise a question of fact as to Omnicare's intent, particularly when documentary evidence supports Omnicare's explanation of those business practices. To take one example, Mr. Wallin discusses a write-off given to Five Star in January 2009. The reason for the write-off, as is evident from the documents and from Mr. Wallin's report, is that Omnicare could not substantiate its billings. Rel. Ex. 22 at 4. It is hard to see how this — though undesirable from Omnicare's perspective — is evidence of an illegal kickback. Accordingly, while Mr. Wallin's testimony would certainly be helpful to the jury in parsing the documents in evidence, the Court does not find that Mr. Wallin's opinions disturb the Court's own reading of the documents, showing no evidence that Omnicare wrote off SNF A/R *in order to* induce referrals.

   *10. Conclusion*

   After a review of the voluminous record in this case, the Court concludes that Relator has failed to show any evidence sufficient to support a finding that Omnicare "willfully" forgave any SNF debt in order to induce future referrals from the SNFs, much less that its intent to do so tainted *all* of the company's Medicare Part D and Medicaid revenue. *See Hockett*, 498 F. Supp. 2d at 57-58 (to survive summary judgment, plaintiff must produce some evidence sufficient to support a finding of the requisite scienter). Relator's summary judgment briefing relies almost entirely on documents rather than testimonial evidence, and those documents, read in context, do not raise a question of material fact as to Omnicare's intent with respect to its relationship with

40

the SNFs. In order to reach a jury, an accusation of a multimillion-dollar fraud must be supported by more than a few ambiguous e-mails. An accusation of fraud should be made cautiously, and only when there is evidence to support it. The collection practices of Omnicare, however, would not seem exceptional, much less fraudulent, to most law firms dealing with their own past-due accounts receivable.

A useful comparison is *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 565 F. Supp. 2d 153 (D.D.C. 2008). In that case, the relator alleged that the defendant improperly gave remuneration to physicians to induce referrals. The court held that the following evidence was sufficient to create a jury question as to whether a defendant violated the AKS:

1) Expert evidence regarding the fair market value of the services performed by the doctors;
2) Evidence that the defendant's business model turned on "census" — the number of patients served by the center;
3) Evidence that the doctors' performance would be evaluated "by measuring census levels generated by his work," and that the defendant could terminate the agreement for lack of referrals; and
4) Evidence that the defendant was focused on referral numbers when conducting contract negotiations with the doctors;
5) Testimony from former employees of defendant that the payments were made in exchange for referrals.

In contrast, Relator here points to no document in the record in which an Omnicare employee discusses a trade-off of Medicare Part A revenue for greater Medicare Part D revenue, or even differentiates between the two revenue streams with respect to a particular SNF — the linchpin of the alleged AKS violations. Perhaps a better-informed relator could have provided the testimony to tie the documents to a scheme of the type alleged here, but on this record, there is no evidence that Omnicare intended to offer or pay kickbacks to the SNFs.

## C. FALSE CLAIMS ACT

Even if Relator had evidence that could prove that Omnicare violated the AKS, she would also need to prove that claims were submitted to the government that were made "false" as a result of those AKS violations. For the reasons discussed here, Relator has failed to raise a question of material fact as to that essential element of her claim.

The False Claims Act punishes both "factually false" and "legally false" claims. A claim is "legally false" when the defendant has provided the goods or services to the government or government beneficiary for the agreed-upon price, but in doing so has violated some other regulation, statute or contract term. 1 John T. Boese, Civil False Claims and Qui Tam Actions § 2.03[G] at 2-187. For liability to attach to a "legally false" claim, the defendant must have certified that it would comply with the statute or regulation as a condition of payment. *Id.* Thus, a violation of the AKS "can only serve as a predicate to FCA liability when 'the government has conditioned payment of a claim upon a claimant's certification of compliance with' that law, and the claimant 'falsely certifies compliance with that statute or regulation.'" *United States ex rel. Parikh v. Citizens Medical Center*, 977 F. Supp. 2d 654, 663 (S.D. Tex. 2013) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997)); *see also Thompson v. LifePoint Hospitals, Inc.*, No. CIV.A. 11-01771, 2013 WL 5970640, at *5 (W.D. La. Nov. 8, 2013) ("A violation of the AKS can serve as the basis for a FCA claim when the Government has conditioned payment of a claim upon the claimant's certification of compliance with the statute, and the claimant falsely certifies compliance.").

In her Third Amended Complaint, which the court reviewed at the time of Omnicare's Motion to Dismiss, Relator stated that Omnicare and the SNFs certified their compliance with the AKS in Medicare enrollment forms and provider agreements and Medicare/Medicaid cost

reports. TAC ¶¶ 245-46, 391, 394, 397, 403. In its Order on the Motion to Dismiss, this Court held that these promises of compliance could support a False Claims Act claim. The Court emphasized that "Defendants are alleged to have signed a document that states in no uncertain terms that payment of future claims is conditioned upon compliance with the AKS.  That document made clear that compliance was 'a *sine qua non* of receipt of state funding.'" Memorandum & Order, Doc. No. 147 at 35 (citing *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996)).

Defendants now contend that, after months of discovery, Relator is unable to introduce any evidence to support her allegations that certifications were made with respect to both Medicaid and Medicare. As the issues are different with respect to the two programs, the Court will consider them separately.

### 1.  Medicare

The parties appear to agree that, contrary to the allegations in Relator's complaint, Omnicare does not itself submit enrollment agreements with respect to its Medicare Part A and Part D pharmacy business.[11] For both of those programs, Omnicare serves as a vendor to entities that have their own agreements with the government. For Medicare Part A, the entities are the SNFs. For Medicare Part D, the entities are the Part D plan sponsors.

In the absence of a certification by Omnicare that it would comply with the AKS, Relator points to certifications made by the SNFs and contends that Omnicare may be held liable for

---

[11] The Government argues that the Court can conclude that Omnicare has certified compliance with the AKS in connection with Medicare Part D based on the existence of a federal regulation requiring it to certify "the accuracy, completeness, and truthfulness of the data" that it provides to Medicare Part D plan sponsors. 42 C.F.R. § 423.505(k)(3). However, certifying the truthfulness of the data is not the same as certifying compliance with the AKS; under applicable Fifth Circuit law, a violation of the AKS is the basis for FCA liability only when "the claimant 'falsely certifies compliance with that statute or regulation.'" *Parikh*, 977 F. Supp. 2d at 663 (quoting *Thompson*, 125 F.3d at 902).

"causing" the SNFs to falsely certify their compliance with the AKS. The Fifth Circuit has held

that third-party claims submissions can be the basis for FCA liability. *See United States ex rel.*

*Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) ("'[A] person need not be

the one who actually submitted the claim forms in order to be liable.'" (quoting *United States v.*

*Mackby*, 261 F.3d 821, 827 (9th Cir. 2001))). However, there must be evidence that the

defendant "*knowingly* caused the submission of" the claim. *United States ex rel. Hutcheson v.*

*Blackstone Med., Inc.*, 647 F.3d 377, 389 (1st Cir. 2011) (emphasis added).

Omnicare makes several objections to Relator's evidence related to the SNF

certifications: First, it contends that there is insufficient evidence of false cost reports actually

submitted by the SNFs. Second, it contends that there is no evidence that anyone at Omnicare

had knowledge of the SNF cost reports or how the debt forgiveness was reported in the cost

reports.

The only cost reports that were put into the record by Relator were attached to her reply

brief in support of her own summary judgment motion.[12] (Doc. No. 417.) In her previous

briefing on the dispositive motions, she relied on expert testimony regarding the legal

requirement that SNFs submit cost reports to establish the existence of the cost reports. *See*

Rel.'s Resp. to Defs.' MSJ, Doc. No. 399 at 44 (citing Bellamy Rep.). Her reply brief includes

cost reports from 12 facilities from the Fundamental chain and a more detailed discussion of one

---

[12] It would have been preferable to have introduced this evidence either in Relator's original
motion or in her response to Omnicare's own summary judgment motion, in order to guarantee
that Omnicare could respond to the new evidence. But as Omnicare addressed this evidence at
the hearing and in its response to the Government's statement of interest, the Court concludes
that it is appropriate to consider Relator's evidence for the purposes of summary judgment. *See*
*Vais Arms, Inc. v. Vais*, 383 F.3d 287, 292 & n.10 (5th Cir. 2004) ("a district court may rely on
arguments and evidence presented for the first time in a reply brief as long as the court gives the
nonmovant an adequate opportunity to respond").

such facility, Alamo Heights Health and Rehabilitation Center ("Alamo"). *See* Rel.'s Ex. 55, 59-69.

Some background is necessary to understand the Alamo cost reports. Relator's evidence of the cost reporting process comes from her expert, David Bellamy. According to Mr. Bellamy's expert report, SNFs report their pharmacy expenditures on a regular basis to the federal government. Expenditures are recorded "in the period in which they are incurred, regardless of when they are paid." Bellamy Rep. at 3 (quoting Provider Reimbursement Manual (CMS Pub. 15)). A short-term liability (such as a drug expense) "must be liquidated within 1 year after the end of the cost reporting period in which the liability is incurred," subject to some exceptions. *Id.* If a cost previously included on a cost report is not liquidated within one year, then an amended cost report should be filed at the end of that year to reflect the nonpayment. *Id.* at 5. The amended cost reports are made via Worksheet A-8. Bellamy Dep. at 123:9-18.

Turning to Relator's example, Alamo's cost report for November and December 2007 reports $30,191 in "Drugs Charged to Patients." Ex. 55 at 99, line 30. According to Relator, an Omnicare aging report shows that no payments were made in November and December 2007.[13] Relator also offers into evidence a worksheet A-8 filed for the period January 2008 through December 2008 showing no adjustments to pharmacy expenditures. Without more, these documents do not prove that the cost reports were false. According to Mr. Bellamy, Alamo would be correct to include costs invoiced in November and December 2007 in its cost report as long as it paid the invoice within a year beginning January 2008. There is no evidence to show that they did not do so. These documents do not raise a question of material fact suggesting that

---

[13] While Relator apparently intended to include the actual aging report as Exhibit 56 to her brief, both Relator's electronically filed brief and the Court's courtesy copy contain a "placeholder" in lieu of the actual aging report.

Alamo submitted false cost reports with respect to pharmacy expenses in one two-month period, much less that all of the SNFs in the case submitted false cost reports on a regular basis throughout the 2005-2008 period.

Mr. Bellamy also suggests that, even if the SNFs' cost reports were scrupulously accurate and properly reflected the write-downs of their accounts payable, the cost reports could still be "false" if the costs were tainted by Omnicare's intent to give remuneration to the SNFs. Mr. Bellamy Rep. at 5. The cost report form requires the SNF to certify that

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT, MAY RESULT.

Ex. 55 at 91; *see also* Bellamy Rep. at 4. Mr. Bellamy appears to be suggesting that, in this circumstance, Omnicare's services would have been "provided … through the payment directly or indirectly of a kickback" and thus the SNFs' certification would be false. However, for the pharmacy services to have been provided "*through* the payment … of a kickback," Relator would have to prove that the offer of remuneration actually induced the SNF to do business with Omnicare — that is, that there was a completed *quid pro quo*. *See also United States ex rel. Thomas v. Bailey*, No. 4:06CV00465 JLH, 2008 WL 4853630, at *10 (E.D. Ark. Nov. 6, 2008) (dismissing FCA claim against hospital because the hospital certified only its own compliance with the AKS, not a third party doctor's). Relator has no evidence to support that claim and no evidence of the mindset of anyone at any SNF when it accepted Omnicare's write-downs. Indeed, the entire premise of her AKS claim is that the AKS punishes even offers of

remuneration that are not knowingly accepted as a kickback by the recipient. Accordingly, the SNFs' certifications in the Medicare cost reports will not support a finding that Omnicare was liable under the False Claims Act for alleged AKS violations.

Even if she could prove that the SNFs had submitted false certifications in their cost reports, Relator would still have to prove that Omnicare "knowingly" caused those certifications to be made. Under the FCA, "knowing" and "knowingly" mean that a person either "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Relator argues that Omnicare's "knowledge" is a question for the jury. In the alternative, she argues that an e-mail from Relator to her boss, Richard Richow, proves that Omnicare had knowledge of the SNFs' false certifications. Relator's e-mail concerns the possible write-off of SNF debt for which Omnicare could not produce backup documentation. In the e-mail, she stated, "I do not want to write this off, if they claimed it on there [sic] cost reports, then they should pay it." Defs.' Ex. 96. While this shows some knowledge of the SNF's cost reporting requirements, it does not show knowledge by anyone at Omnicare that the SNFs were *actually submitting* false cost reports. Relator's speculations, taken alone, do not raise a question of material fact as to Omnicare's knowledge. And at summary judgment, Omnicare does require some evidence in the record from which the jury could infer knowledge; Relator has offered none.

At the hearing on summary judgment, Relator cited two additional cases that she claims support a finding of FCA liability based on third parties' submission of false certifications of AKS compliance and related claims. Neither of those cases provides the support Relator requires. In the first, *United States ex rel. Bennett v. Medtronic, Inc.*, the relators sought to hold

Medtronic, Inc., liable for false claims submitted by third-party physicians and hospitals. 747 F. Supp. 2d 745 (S.D. Tex. 2010). At the motion to dismiss stage, the court held that relator had never even alleged that defendants "caused any physicians or hospital to make false certifications of compliance," and dismissed those claims. *Id.* at 784. While the *Bennett* court certainly contemplated the possibility of third-party certifications, the case is not instructive on the question of what evidence is required at summary judgment to show a knowing and causal link between a defendant's action and a false certification.

In *United States ex rel. King v. Solvay SA et al*, the relator brought claims against a pharmaceutical company for, *inter alia*, paying kickbacks to physicians who then prescribed the company's drugs to their Medicare or Medicaid patients. No. 4:06-cv-2662 (S.D. Tex.). When the patients filled those prescriptions at a pharmacy, the pharmacists submitted those claims for reimbursement from the government. As pleaded in relator's complaint, this gave rise to FCA liability because both the physicians and the pharmacies certified that they would comply with health care laws, including the AKS. At the 12(b)(6) stage, the court held that relator had stated a claim for relief under the FCA because — allegedly — the physician knowingly submitted a false certification to the government, and the pharmacies later relied on that representation in making their own certification. *King*, No. 4:06-cv-2662, slip op. at 7-8 (S.D. Tex. Aug. 29, 2012). That is, according to the pleadings in *King*, there was at least one knowing certification of compliance with the law by a participant in the kickback scheme. That is different from the situation here, at summary judgment, where Relator has not attempted to offer evidence that the SNFs were knowing participants in a kickback scheme with Omnicare.

The Government's preferred citation, *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235 (3d Cir. 2004), likewise is unavailing. In that decision, made at the motion to dismiss

48

stage, the court allowed an FCA claim to go forward where the defendant did not directly submit a fraudulent claim to the government, but knew that its payment of kickbacks would cause a third party to do so. The relator alleged that the defendant "created and pursued a marketing scheme that it knew would, if successful, result in the submission by Mercy and others similarly situated of compliance certifications required by Medicare that Zimmer knew would be false." *Id.* at 244. In other words, the defendant allegedly knew that there would be false certifications flowing from the scheme. In the instant case, at the summary judgment stage, there is simply no evidence that anyone at Omnicare had that knowledge.

At summary judgment, the Court scrutinizes the evidence that Relator is actually able to put forth on the record. While the Court must draw all inferences in support of the non-moving party, the Court cannot draw inferences that are unsupported by evidence. Here, Relator asks the Court to make too many inferential leaps from a scant record. Without evidence of a false certification by a SNF and without evidence that Omnicare knew that false certifications were being made, Relator is not entitled to present her Medicare FCA claims to a jury.

### 2.  Medicaid

The situation is somewhat different with respect to the Medicaid claims. Omnicare did submit enrollment forms for the state Medicaid programs in which it participated. Nonetheless, Omnicare argues that those enrollment forms do not support FCA liability for two reasons. First, Relator does not have evidence to support a finding that the certifications were "knowing." Second, states only make AKS compliance a condition of participation in their Medicaid programs, not a condition of payment. Certifications of AKS compliance can only give rise to an FCA claim when payments are conditioned on those certifications.

The requirement that the false claim be "knowing" is an important limitation on FCA liability. "To avoid summary judgment for the defendant, admissible, credible evidence of a knowing false claim or statement is required." 1 BOESE § 2.06[C] at 304-05. The case of *United States ex rel. Taylor-Vick v. Smith* is instructive. 513 F.3d 228 (5th Cir. 2008). In that case, much as here, the relator argued that the Fifth Circuit "disfavors granting summary judgment on an issue that turns on a state-of-mind determination." *Id.* at 231. While acceding to that general principle, the Fifth Circuit made clear that a relator "cannot survive summary judgment merely by submitting evidence of false claims; she must have evidence that the defendants knowingly or recklessly cheated the government." *Id.* at 232. Furthermore, evidence of a profit motive — which Relator certainly has — is not equivalent to evidence of a knowing intention to violate the FCA. *See United States ex rel. Gudur v. Deloitte & Touche*, No. 07-20414, 2008 WL 3244000 (5th Cir. Aug. 7, 2008) (per curium).

Omnicare further argues that Relator must prove that *a specific individual* had knowledge of the false certification being submitted. Omnicare cannot be liable for FCA violations based on "collective knowledge" of a number of employees. *See United States v. Science Applications Int'l Corp. (SAIC)*, 626 F.3d 1257, 1275 (D.C. Cir. 2010); *United States v. Bollinger Shipyards, Inc.*, No. CIV.A. 12-920, 2013 WL 393037, at *9 (E.D. La. Jan. 30, 2013) (dismissing complaint because it "never specifically allege[d] … that the unnamed Bollinger VP who signed the certification knew that they were not satisfied"). Instead, Relator must show that a particular individual at Omnicare caused the false claim to be made, either knowingly or in reckless disregard of the truth of the certification. *SAIC*, 626 F.3d at 1276. In a false certification case, like this one, this requirement is best understood to require that Relator show someone at Omnicare who 1) knew that the company certified its compliance with the AKS in connection

with Medicaid claims and 2) had knowledge of the AKS violations. Relator has evidence that many individuals at Omnicare knew generally that the company had a duty to comply with the AKS, a criminal statute. *See* Keefe Dep. at 180:1-181:10; Richow Dep. at 166:8-12, 205:19-25; Rosenzweig Dep. at 244:5-245:21. But even assuming that there was an AKS violation, Relator points to no evidence that any of those individuals knew that Omnicare submitted certifications of compliance with the AKS in connection with the company's enrollment in Medicaid. Neither in its written submission nor at oral argument did Relator offer a single name. The case law is clear that "[t]he FCA is a fraud prevention statute, and 'not a general enforcement device for federal statutes, regulations and contracts.'" *United States ex rel. Patton v. Shaw Services, L.L.C.*, 418 Fed. Appx. 366, 369 (5th Cir. 2011) (per curiam) (quoting *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010)). Without knowledge of a certification by someone at Omnicare, there is no fraud.

Because of the total lack of evidence related to the FCA scienter requirement as applied to the Medicaid claims, Relator's allegations of FCA liability fail as to those claims. As the parties' briefs do not clearly join issue on Omnicare's second argument — that the Medicaid enrollment applications require AKS compliance as a condition of participation, rather than of payment — the Court declines to consider whether that argument also supports dismissal of the Medicaid claims.

Because the Court granted Defendants' Motion for Summary Judgment as to all of Relator's False Claims Act claims, it need not reach Relator's Motion for Summary Judgment as to the measure of damages or Omnicare's affirmative defenses.

### D. REVERSE FALSE CLAIMS ACT

Relator and Omnicare have also cross-moved for summary judgment on Relator's claims

under the so-called Reverse False Claims Act, 31 U.S.C. § 3729(a)(7). This provision imposes liability on any party who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." In other words, it penalizes false records or statements that allow a defendant to avoid making a payment to the government. *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004).

Relator's claim is based on a Corporate Integrity Agreement (CIA) that Omnicare signed with the government in settlement of a previous dispute. *See* Defs.' Ex. 198. The CIA required Omnicare to disclose all "Reportable Events." *Id.* at 16. A Reportable Event is defined as either "a substantial Overpayment" by a government health care program or "a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program." *Id.* Omnicare is required to make a disclosure only after it "determines (after a reasonable opportunity to conduct an appropriate review or investigation of the allegations) through any means that there is a Reportable Event." *Id.* In addition, the agreement requires Omnicare's Compliance Officer to certify annually that "to the best of his or her knowledge … Omnicare is in compliance with all of the requirements of the CIA." *Id.* at 22.

Relator contends that Omnicare violated the CIA when it did not include her e-mail in a list of Reportable Events in the CIA Annual Report for November 2007 through November 2008. *See* Rel.'s Ex. 168. Omnicare argues that Relator's e-mail did not constitute a Reportable Event because 1) it alleged Medicare fraud *by the SNFs*, not by Omnicare, 2) Relator has not shown that Omnicare "determine[d]" that there had been a Reportable Event after an investigation, and 3) Relator has no evidence that Omnicare "knowingly" certified its compliance with the CIA despite knowing of Relator's complaint.

52

In order for Relator's e-mail to constitute a Reportable Event under the CIA, Relator must prove that the underlying facts constituted a "matter that a reasonable person would consider a probable violation" of the law by Omnicare. Defs.' Ex. 198 at 16. Read as a whole, Relator's e-mail is complaining about the SNFs' conduct, not Omnicare's. Relator wrote, "[The contract renewals] should absolutely NOT be approved until the accounts are brought current. … They have been reimbursed ad [sic] they need to pay. This is Medicare fraud." Defs.' Ex. 197. The SNFs' collecting Medicare reimbursements for costs not actually incurred could be deemed fraudulent. But nothing in the law prohibits Omnicare from renewing a contract with a SNF that has outstanding past-due A/R. This strongly indicates that Relator's e-mail — which does not suggest that Omnicare had the requisite intent to pay a kickback — referred to unlawful conduct by the SNFs, not by Omnicare.

More importantly, however, Relator has introduced no evidence to show that Omnicare "determine[d]" that there had been a Reportable Event, or that it behaved unreasonably in conducting an investigation of Relator's allegation. A determination by Omnicare that a Reportable Event occurred is a condition precedent to the duty to report. Defs.' Ex. 198 at 16-17. The only evidence related to an investigation in the record is testimony by former Omnicare CEO Joel Gemunder, who testified that he "did not know" whether there was a follow-up investigation. Rel.'s Ex. 64 at 127:16-17. Given that the duty to report a Reportable Event to the government was not triggered until the results of such an investigation were known, there is not sufficient evidence in the record for a jury to conclude that the CIA was in fact breached. Accordingly, the Court will grant Omnicare's motion and dismiss the Reverse False Claims Act claim against it.

### E.  CONSPIRACY

Omnicare has moved for summary judgment on Relator's claim that Omnicare conspired with the SNFs to violate the False Claims Act. To prove a conspiracy under § 3279(a)(3) of the FCA, the relator must show (1) the existence of an unlawful agreement with another party to get a false or fraudulent claim allowed or paid by the government and (2) at least one act performed in furtherance of that agreement. *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008). As a part of that showing, the relator must demonstrate "that defendants 'shared a specific intent to defraud the [G]overnment.'" *Id.* (quoting *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg's Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003).

For purposes of summary judgment, Relator "must show specific evidence that would allow a reasonable jury to find that these conditions have been met." *Farmer*, 523 F.3d at 343. In her response to Omnicare on this issue, Relator cites no evidence in the record to support her assertion that "Omnicare made agreements to engage in unlawful conduct." There are no documents or testimony showing a "meeting of the minds" between Omnicare and the SNFs regarding any of the alleged unlawful conduct. At most, Relator might point to the settlement agreements in which the parties agreed to the forgiveness of some of the SNFs' past-due A/R as evidence of an agreement. But that is not enough, as *Farmer* illustrates. In that case, the relator attempted to overcome summary judgment with evidence that the alleged conspirators jointly signed and submitted claims for payment. The Fifth Circuit held that such evidence was not sufficient to prove that both conspirators had an agreement to defraud the government; at best, it would show that one party was negligent. Summary judgment is appropriate for Omnicare on this claim.

## F.  STATE FALSE CLAIMS ACT CLAIMS

Omnicare has also moved for summary judgment on Relator's claims pursuant to various

state-law analogues of the Federal False Claims Act. The parties agree that these claims are premised on the same conduct as the federal False Claims Act claims, and stand or fall with the federal claims. *See* Defs.' Mot. at 45-46; Rel.'s Response at 50. For the reasons previously stated, the Court is granting summary judgment in favor of Omnicare on the federal claims, and does the same with respect to Relator's state law claims.

### G. COUNTERCLAIMS

Finally, Relator has moved for summary judgment on Omnicare's counterclaims. Omnicare has asserted counterclaims against Relator for (1) breach of fiduciary duty; (2) civil conspiracy; (3) breach of implied contract; (4) promissory estoppel; and (5) misappropriation of trade secrets.[14] Relator contends that all of these claims must fail because Omnicare has not presented any evidence of damages. Omnicare concedes that it cannot show actual damages but contends that it is entitled to proceed to trial to seek nominal damages and an injunction.

In general, under Kentucky law, a party who can prove a legal injury but cannot prove compensatory damages is entitled to nominal damages. *See Stoll Oil Ref. Co. v. Pierce*, 343 S.W.2d 810, 811 (Ky. 1961); *W. Union Tel. Co. v. Guard*, 139 S.W.2d 722, 728 (Ky. Ct. App. 1940). Relator asserts that nominal damages are not available where there is no effort to prove actual damages. However, the case that she cites for this proposition is inapposite: in that case, plaintiff sought nominal damages based on the breach of an alleged oral agreement. *See Miles Farm Supply, LLC v. Independent Bank*, No. 2006-CA-002356-MR, 2008 WL 746542, at *2 (Ky. App. Mar. 21, 2008). The court held that there was no evidence of any agreement sufficient to overcome summary judgment. *Id.* In fact, the opinion in *Miles* strongly suggests that had there been evidence of an agreement, an action for solely nominal damages would have been

---

[14] The Court previously dismissed a counterclaim for conversion. (Doc. No. 414.)

permitted. In the absence of any authority to the contrary, the Court must allow Omnicare to seek nominal damages at trial.

In addition, Omnicare is seeking injunctive relief based on a likelihood of future irreparable harm (here, the harm that would occur if its confidential documents were provided to competitors). Omnicare will present testimony establishing the harm that would occur if Relator were permitted to retain and disseminate the documents. *See* Declaration of Richard Richow, Defs.' Response to MSJ Ex. 214; Report of Robert Palumbo (explaining harm that would result if Omnicare documents were given to competitors).[15] Injunctions are regularly issued to protect trade secrets in misappropriation cases based on the type of evidence offered by Mr. Richow and Mr. Palumbo. Based on the potential availability of nominal damages and injunctive relief, the Court will deny Relator's Motion for Summary Judgment as to Omnicare's remaining counterclaims.

The Court does have serious reservations about the utility of a jury trial on these counterclaims, where the only damages at stake are nominal ones. Relator suggests that further

---

[15] Relator has moved to strike this declaration. (Doc. No. 416.) She argues that Mr. Richow's declaration should be stricken because it is 1) not based on his personal knowledge and 2) a sham affidavit that is inconsistent with his prior deposition testimony. Relator evidently perceives an inconsistency between Mr. Richow's deposition testimony, in which he testified that he did not know what documents Relator allegedly took from Omnicare, and his affidavit, which discusses the harm that would result to Omnicare if the documents were disclosed to Omnicare's competitors. *Compare* Richow Dep. Doc. No. 416-2, *with* Richow Decl., Doc. No. 416-5. However, the declaration makes clear that Mr. Richow is not testifying about which documents Relator took from Omnicare. Instead, he states that he "reviewed the documents *that Omnicare claims* Susan Ruscher improperly took, or had others improperly take on her behalf." Richow Decl. at ¶ 3. He then offers evidence of the effect of the release of those documents to Omnicare's competitors, based on his knowledge of Omnicare's business. *Id.* ¶¶ 4-Mr. Richow's opinions are conditionally relevant: If Omnicare can prove by other means that Relator improperly took the documents listed in the April 17, 2015 letter, or arranged with others to have the documents taken, then Mr. Richow's opinions about the effect of the disclosure of those documents becomes relevant. *See* Fed. R. Evid. 104(b). Because Mr. Richow's testimony will be permissible if Omnicare can lay a proper foundation at trial, the Court **DENIES** Relator's Motion to Strike.

disclosure of Omnicare documents is already prohibited by this Court's confidentiality order, Rel.'s Reply Br. at 4. The Court urges the parties to attempt to reach an agreement on an order that the Court could enter to provide Omnicare with any additional protection against future disclosure that it believes is required.

## V.      CONCLUSION

The Court well realizes, of course, that counsel for each side have devoted enormous resources, including their considerable talent, during the seven-year narrative of this litigation. Especially because of their commitment, the Court regrets that either side has to be disappointed. Nonetheless, for Relator's case to survive summary judgment would require not only a substantial extension, but also a distortion, of the applicable precedents.

For the foregoing reasons, Omnicare's Motion to Strike Relator's Supplemental Expert Reports (Doc. No. 365) is **GRANTED** in part and **DENIED** in part. Relator's *Daubert* motion (Doc. No. 378) is **DENIED**. Omnicare's *Daubert* motions (Doc. Nos. 379, 381, 383) are **GRANTED** in part and **DENIED** in part. Omnicare's Motion for Summary Judgment (Doc. No. 385) is **GRANTED,** and Relator's Motion for Partial Summary Judgment (Doc. No. 371) is **DENIED**. Relator's Motion to Strike Defendants' Summary Judgment Evidence is **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on the 3rd of September, 2015.


KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE